**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**LEHMAN BROTHERS INC.,**<br><br>          **Debtor.** | ECF Case<br><br><br>**14-CV-00535 (SAS)** |

| |
|---|
| **MOORE CAPITAL MANAGEMENT, LP on behalf of MOORE GLOBAL INVESTMENTS, L.P.,**<br><br>          **Claimant,**<br>       -against-<br>       .<br>**JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.,**<br><br>          **Debtor.** |

---

## MEMORANDUM OF LAW IN OPPOSITION TO TRUSTEE'S
## MOTION FOR SUMMARY JUDGMENT

---

**SCHLAM STONE & DOLAN LLP**
**26 Broadway**
**New York, New York 10004**
**(212) 344-5400**
**Erik S. Groothuis**
**Samuel L. Butt**

**TEIGLAND-HUNT LLP**
**127 West 24th Street, 4th Floor**
**New York, New York 10011**
**(212) 269-1600**
**Lauren Teigland-Hunt**

*Attorneys for Claimant*
*Moore Capital Management, LP, on behalf of Moore Global Investments, L.P.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii-vi

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................3

I.    MGI IS ENTITLED TO CUSTOMER PROTECTION UNDER
THE BANKRUPTCY CODE ................................................................................3

    A.    MGI's FX Contracts Were Similar To FX Futures And
Therefore Were Commodity Contracts Under
The Bankruptcy Code ...............................................................................3

    B.    The Bankruptcy Code's Definition of "Forward Contract"
Does Not Preclude MGI's FX Contracts From Being
"Commodity Contracts" ............................................................................9

    C.    MGI Is a "Customer" and Its Cash Balances Are
"Customer Property" Under the Bankruptcy Code ..................................15

II.    THE FUTURES CUSTOMER AGREEMENT IS A COMMODITY
CONTRACT UNDER SECTION 761(4)(J) ........................................................16

III.    SIPA'S DEFINITION OF "CUSTOMER" IS NOT CONTROLLING
BECAUSE LBI WAS JOINTLY REGISTERED AS AN FCM .........................16

IV.    MGI IS ENTITLED TO CUSTOMER STATUS BY VIRTUE OF LBI'S
INCLUSION OF MGI'S FUNDS IN LBI'S 15C3-3 CALCULATION ..........................18

V.    MGI WOULD BE ENTITLED TO CUSTOMER PROTECTION EVEN
HAD THE TRUSTEE APPLIED THE PART 190 REGULATIONS .............................20

    A.    The Trustee Never Administered An FCM Estate Or Applied
The Part 190 Regulations ........................................................................20

    B.    The Part 190 Regulations Support MGI's Position In Any Event ........................21

        1.    MGI Is A "Customer" And Its Net Cash Balances Are
"Customer Property" Under The Part 190 Regulations ..............................21

        2.    MGI's Cash Balances Were "Segregated" On The Filing Date ...............22

        3.    MGI Is A Customer Because Its Claims Are Not "Solely
On Account Of A Forward Contract" .......................................................24

        4.    MGI Is Claiming Customer Property, Not Forward Contracts .................24

VI.    MGI'S NET CASH BALANCES ARE NOT PROPERTY
OF THE ESTATE....................................................................................................25

CONCLUSION...............................................................................................................25

## **TABLE OF AUTHORITIES**

**CASES**

*Commodity Futures Trading Commission v. Standard Forex, Inc.*,
No. CV-93-0088 (CPS), 1993 WL 809966 (E.D.N.Y. Aug. 9, 1993) .................................6

*Dunn v. Commodities Futures Trading Commission*,
519 U.S. 465 (1997) .........................................................................................................7

*Grede v. FCStone, LLC*,
746 F.3d 244 (7th Cir. 2014) ...........................................................................................21

*In re Bernard L. Madoff Investment Securities, LLC*,
654 F.3d 229 (2d Cir. 2011) .....................................................................................17, 19

*In re Lehman Brothers. Inc.*,
474 B.R. 139 (Bankr. S.D.N.Y. 2012) ......................................................................17, 18

*In re Magnesium Corporation of America*,
460 B.R. 360 (Bankr. S.D.N.Y. 2011) ............................................................................10

*In re MF Global Inc.*,
2012 WL 2202973 (Bankr. S.D.N.Y. June 14, 2012) .....................................................18

*In re New Times Securities Services*, *Inc.*,
463 F.3d 125 (2006) ..................................................................................................17, 19

*In re Olympic Natural Gas*,
294 F.3d 737 (5th Cir. 2002) ...........................................................................................13

*In re Omni Mutual, Inc.*,
193 B.R. 678 (S.D.N.Y. 1996) ..................................................................................17, 19

*In re Peregrine Financial Group, Inc.*,
510 B.R. 190 (Bankr. N.D. Ill. 2014) ...........................................................................4, 6

*In re Peregrine Financial Group, Inc.*,
487 B.R. 498 (Bankr. N.D. Ill. 2013) ...............................................................................4

*In re Peregrine Financial Group, Inc.*,
2014 WL 2197945 (N.D. Ill. May 27, 2014) ....................................................................5

*In re Zelener*,
373 F.3d 861 (7th Cir. 2004) ....................................................................................4, 5, 6

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .............................................................................................7

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,*
    456 U.S. 353, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982)....................................7

*Securities Exchange Commission v. Baroff,*
    497 F.2d 280 (2d Cir. 1973)..............................................................17, 19

*Transnor (Bermuda) Ltd. v. BP North America Petroleum,*
    738 F. Supp. 1472 (S.D.N.Y. 1990)........................................................10

## STATUTES, LAWS, REGULATIONS, RULES

11 U.S.C. § 101(22).........................................................................12

11 U.S.C. § 101(25) (2008) ...................................................... 1, 9-15, 24, 25

11 U.S.C. § 561...........................................................................13

11 U.S.C. § 562.......................................................................13, 16

11 U.S.C. § 761.........................................................3, 8, 9, 12, 17, 24

11 U.S.C. § 761(4)...................................................................7, 13, 21

11 U.S.C. § 761(4)(A)..................................................................3, 9, 11

11 U.S.C. § 761(4)(B)......................................................................10

11 U.S.C. § 761(4)(C)....................................................................7, 10

11 U.S.C. § 761(4)(E)....................................................................7, 10

11 U.S.C. § 761(4)(F) (2008)..........................................................*passim*

11 U.S.C. § 761(4)(F)(i) (2010)............................................................8

11 U.S.C. § 761(4)(J) (2008) ............................................................1, 16

11 U.S.C. § 761(8)........................................................................12

11 U.S.C. § 761(9)........................................................................22

11 U.S.C. § 761(9)(A).....................................................................24

11 U.S.C. § 761(9)(A)(i) (2008).......................................................11, 24

11 U.S.C. § 761(9)(A)(ii) (2008).........................................................24

11 U.S.C. § 761(9)(A)(ii)(II) (2008) ..................................................................................3, 15

11 U.S.C. § 761(10)(A)(i) (2008) .....................................................................................15, 22

11 U.S.C. § 762 ..............................................................................................................................17

11 U.S.C. § 763 ..............................................................................................................................17

11 U.S.C. § 764 ..............................................................................................................................17

11 U.S.C. § 765 ..............................................................................................................................17

11 U.S.C. § 766 ..............................................................................................................................17

11 U.S.C. § 767 ..............................................................................................................................17

15 U.S.C. § 78bb(e) ......................................................................................................................19

15 U.S.C. § 78lll(2) .......................................................................................................................17

17 C.F.R. Part 190 .........................................................................................................................18

17 C.F.R. § 30.7 ......................................................................................................................21, 23

17 C.F.R. § 190.01(g) (2008) ......................................................................................................21

17 C.F.R. § 190.01(gg) (2008) ....................................................................................................11

17 C.F.R. § 190.01(k) (2008) ......................................................................................................21

17 C.F.R. § 190.07(e)(2) (2008) ................................................................................................11

17 C.F.R. § 190.08(a)(1)(i)(A) ..................................................................................................22

17 C.F.R. § 190.08(a)(2)(iii) (2008) .........................................................................................23

17 C.F.R. § 190.10(3) (2008) ......................................................................................................24

48 Federal Regulations 8716 (Mar. 1, 1983) ........................................................................25

48 Federal Regulations 8738 (Mar. 1, 1983) ........................................................................25

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat.
1376 (2010) ......................................................................................................................................8

Federal Credit Union Act ...........................................................................................................14

Federal Deposit Insurance Act ..................................................................................................14

Federal Rule of Civil Procedure Rule 30(b)(6) ....................................................................23

Investment Advisers Act ................................................................................................21

Local Rule 56.1 ................................................................................................. *passim*

Pub. L. No. 98-353, 98 Stat. 333 § 421(j)(5) .............................................................12

Pub. L. No. 101-311, 104 Stat. 267 § 201(1)(A) (1990) ............................................12

Securities Exchange Commission Rule 15c3-3 ................................................ *passim*

### OTHER AUTHORITIES

Amendments to Fin. Responsibility Rules for Broker-Dealers, SEC Release No. 55431, 2007 WL 737662, at *2 (Mar. 9, 2007) ....................................................................................20

Edward F. Greene et al., U.S. REGULATION OF THE INTERNATIONAL SECURITIES AND DERIVATIVES MARKETS 12-104 (10th ed. 2012) ............................................................6

*First Nat'l Monetary Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,698, at 30,970 (1985), available at 1985 WL 55299, *6 ..........................................................8

H.R. No. 109-31(I), 121 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 183 ...................14

http://www.cftc.gov/ucm/groups/public/@financialdataforfcms/ documents/file/fcmdata1014.pdf. ...........................................................................18

Jerry W. Markham, THE HISTORY OF COMMODITY FUTURES TRADING AND ITS REGULATION 183-184, 195-199 (1987) ..........................................................................................7

S. Rep. No. 98-65, 54 (1983), 1983 WL 506599 at *7 .................................................11

S. Rep. 101-285 1990 WL 259288, at VI .............................................................12, 15

Moore Capital Management, LP, on behalf of claimant MGI[1], submits this memorandum of law, together with the declarations of Erik S. Groothuis ("Groothuis Opp. Decl.") and James Danza ("Danza Opp. Decl."), and MGI's Local Rule 56.1(b) statement, in opposition to the Trustee's motion for summary judgment confirming the Trustee's Determination of the MGI Claims ("Motion").

## <u>INTRODUCTION</u>

The Trustee's Motion should be denied for several reasons.

First, MGI is entitled to customer protection under the Bankruptcy Code because MGI's FX Contracts were similar to FX Futures captured in 11 U.S.C. § 761(4)(A) and were therefore "commodity contracts" under 11 U.S.C. § 761(4)(F) (2008).[2]   The plain terms of 11 U.S.C. § 101(25)(A), which defines a "forward contract" for purposes of the Bankruptcy Code generally and is relied upon heavily by the Trustee, do not require a contrary result.   The Trustee mistakenly maintains that MGI is arguing that *all* FX Forwards are commodity contracts, and that, under such an interpretation, section 761(4)(F) would swallow the definition in section 101(25)(A).   But that is not MGI's position.   MGI merely contends that its FX Contracts, not all FX Forwards, were similar to FX Futures based on their distinctive features; as a result, MGI's FX Contracts were commodity contracts and not forward contracts under the Bankruptcy Code. In addition, MGI's Futures Customer Agreement with LBI is a "commodity contract" pursuant to 11 U.S.C. § 761(4)(J).

---

[1] Capitalized terms used herein and not otherwise defined are defined as in MGI's December 1, 2014 Brief in Support of its Motion for Summary Judgment, Docket Entry No. 42 ("Opening Brief").

[2] Unless otherwise noted, all citations to statutes and regulations are to those in effect as of the Filing Date.

Second, and contrary to the Trustee's assertion, the SIPA definition of "customer" does not preclude MGI from receiving customer treatment.  MGI was a customer of LBI's FCM business, not LBI's broker-dealer business.  For that reason, as the Trustee concedes, he is required to apply the relevant commodity broker liquidation provisions of the Bankruptcy Code to determine whether MGI is entitled to customer treatment; for the reasons set forth in the Opening Brief and below, these provisions dictate that MGI be treated as a customer.

Third, MGI is entitled to customer protection because its funds were indisputably required to be protected under SEC Rule 15c3-3 and, according to the Trustee, were in fact included in LBI's Rule 15c3-3 reserve calculation.

Fourth, the Trustee misrepresents MGI's legal position by arguing that MGI's Claims do not qualify as customer claims due to the CFTC's Part 190 Regulations' exclusion of "forward contracts" from the definition of "customer property."  MGI's FX Contracts were not forward contracts as a matter of law, and MGI's Claims seek to recover MGI's Cash Balances, not contracts of any description.  MGI's Cash Balances are protected under the Part 190 Regulations for the same reasons they are protected under the Bankruptcy Code.

Finally, MGI's Cash Balances are not property of the estate under any theory, since MGI posted such cash solely as security to LBI, and LBI was prohibited by contract from using MGI's funds absent a default by MGI, which did not occur.  The Trustee cannot obtain greater rights to MGI's property than LBI, as debtor, had in the first instance.[3]

---

[3] The Trustee also misleadingly states that MGI will receive a "substantial though not 100% distribution" as if to suggest that MGI's recovery is likely to be close to 100% as a general creditor.  However, it is currently estimated that MGI would receive less than half (approximately 42%) of its Net Cash Balances if MGI is classified as an unsecured creditor.

## ARGUMENT

**I.      MGI IS ENTITLED TO CUSTOMER PROTECTION UNDER THE BANKRUPTCY CODE**

The Trustee contends that MGI is not entitled to customer protection under the Bankruptcy Code because MGI's FX Contracts were not "commodity contracts," and thus MGI was not a "customer," under the Code's definitions.  (*See*, *e.g.*, Trustee's Br. at 18-19.)  This argument fails for several reasons.

### A.   MGI's FX Contracts Were Similar To FX Futures And Therefore Were Commodity Contracts Under The Bankruptcy Code

As set forth in MGI's Opening Brief, at 8, section 761 of the Bankruptcy Code provides that, with respect to an FCM, a "customer" is an "entity that holds a claim against [an FCM] arising out of … a deposit or payment of cash, a security, or other property with such [FCM] for the purpose of making or margining … a commodity contract."  11 U.S.C. § 761(9)(A)(ii)(II) (2008).  The Trustee does not dispute that FX Futures are commodity contracts pursuant to 11 U.S.C. § 761(4)(A) or that MGI's Cash Balances were posted for purposes of margining trading in MGI's futures customer accounts.  Thus, if MGI's FX Contracts met 11 U.S.C. § 761(4)(F)'s definition of a "commodity contract" by virtue of their similarity to FX Futures captured in 11 U.S.C. § 761(4)(A), then MGI is a "customer."  For all the reasons set forth in MGI's Opening Brief, at 9-16, and below, including the fact that LBI required MGI to post margin in respect of its FX Contracts based on the margin that would be due in respect of corresponding FX Futures (SOF ¶¶ 35-36)[4], MGI's FX Contracts are similar to FX Futures, and MGI has established its entitlement to "customer" status.

---

[4] The Trustee argues that credit risk is a distinguishing factor between MGI's FX Contracts and FX Futures  (Trustee's Br. at 20), yet the credit risk mitigation technique employed by LBI and MGI with respect to their FX Contracts is precisely that employed by clearing houses with

The Trustee's contention that the FX Contracts are dissimilar to FX Futures rests solely on two cases from the Seventh Circuit that are both easily distinguishable from this case and at odds with the settled law of this Circuit.

As the Trustee concedes, the claimants in *In re Peregrine Fin. Grp. Inc.*, 510 B.R. 190, 194 (Bankr. N.D. Ill. 2014), *appeal docketed sub. nom. Secure Leverage Grp., Inc. v. Bodenstein,* No. 14 CV 05024 (N.D. Ill. Jul. 2, 2014), engaged in spot foreign currency and metal transactions for *immediate*, not future, delivery, in sharp contrast to MGI's FX Contracts. (Trustee's Br. at 19.)  Although the *Peregrine* court mentioned, in a footnote, that its conclusion that the transactions at issue were not futures contracts would have been the same under the *In re Zelener*, 373 F.3d 861 (7th Cir. 2004) standard if the transactions had been forwards rather than spot transactions, 510 B.R. at 195, n. 4, this comment was *dicta.   Id*.   While *Peregrine* considered whether the retail, spot foreign currency transactions at issue were similar to FX Futures under § 761(4)(F), that court's holding does not apply to MGI's FX Contracts and would be at odds with the case law in this Circuit, as set forth in MGI's Opening Brief at 12-14.

The *Peregrine* case is distinguishable from this one for a number of reasons.  **First**, as an earlier decision in the *Peregrine* action made clear, the *Peregrine* claimants expressly granted Peregrine the right to use the funds they posted as margin in Peregrine's business.  *See In re Peregrine Fin. Grp., Inc*., 487 B.R. 498, 507 (Bankr. N.D. Ill. 2013).  Here, by contrast, at no time did MGI grant LBI the right to use MGI's funds in LBI's business, except in the limited circumstance—which never transpired—where MGI defaulted on its obligations to LBI.  (SOF

---

respect to futures contracts: margining.  LBI and MGI employed exchange-style initial and variation margining arrangements with respect to the FX Contracts as though they were exchange-traded futures, calculating the amount of margin due by reference to the amount of margin required by an actual futures exchange in respect of a closely corresponding exchange-traded futures contract.

¶¶ 11-12.)[5]   **Second**, whenever MGI wired funds to LBI, it wired them into a segregated customer funds account at JPMorgan Chase at the direction of LBI.  (SOF ¶ 14).  There is no indication that the *Peregrine* claimants wired funds to a segregated customer account.  **Third**, the *Peregrine* claimants received e-mails with explicit warnings that their funds would not receive priority in the event of a bankruptcy, *In re Peregrine Fin. Grp, Inc.*, 2014 WL 2197945, *5, *7-8 (Bankr. N.D. Ill. May 27, 2014),) and received and executed a risk disclosure document acknowledging the same.  487 B.R. at 506.  MGI, by contrast, was never notified by LBI that its assets might not be protected as customer property in the event of LBI's bankruptcy.  As set forth in MGI's Opening Br. at 4-5, LBI told MGI the exact opposite.  **Fourth**, Peregrine was solely an FCM and not jointly registered as a broker-dealer as LBI was, and thus Rule 15c3-3's customer asset protection regime, as discussed in MGI's Opening Brief at 19-23 and below at 18-20, did not apply to the *Peregrine* customers.  510 B.R. at 192 (noting Peregrine's status as an FCM).

*Zelener*, which was binding precedent for the *Peregrine* court and on which the Trustee heavily relies, did not even address the similarity of futures contracts to other contracts under section 761(4)(F).  Rather, the *Zelener* court determined that spot transactions were not *equivalent to* futures contracts.  That holding has no bearing here because MGI's position is much different:  MGI contends that its FX Contracts—which resemble FX Futures far more than the spot transactions at issue in *Peregrine* and *Zelener*—are merely "similar to," not the same as, FX Futures contracts.

The uncontradicted evidence demonstrates that, whenever MGI needed to decrease the net open hedging position it had in one of the MGI Accounts, MGI and LBI would enter into an offsetting FX Contract.  (Declaration of J. Danza, dated December 1, 2014, Docket No. 44, ¶ 8;

---

[5] "SOF" refers to MGI's Rule 56.1(a) Statement submitted on December 1, 2014.

*see also* Danza Opp. Decl. ¶ 7; Trustee's Br. at 4.)  These offsets were possible because MGI's FX Contracts were standardized.[6]  As the *Zelener* court noted, where the seller of contracts promises to sell another contract against which the buyer can offset the first contract, such a promise would create a futures contract.  *Zelener*, 373 F.3d at 868.  Significantly, MGI had the ability to offset the FX Contracts sold to it by LBI (and a five-year history of actually engaging in such offsetting transactions), whereas there was no such ability to offset the transactions at issue in either *Zelener*, 373 F.3d at 868, or *Peregrine*, 510 B.R. at 197.

The Trustee cites to the deposition of Dr. Barnes for the proposition that MGI's FX Contracts could not be closed out by traded offset, but the cited testimony concerned FX Forwards generally, not MGI's FX Contracts specifically.  (Trustee's Br. at 20 (citing Barnes Dep. at 88).)  Further, Dr. Barnes was not asked during his deposition about MGI's ability to offset its FX Contracts with LBI, which MGI could, and regularly did, do.  The Trustee further misrepresents Dr. Barnes' testimony when he argues that Dr. Barnes conceded that certain distinctions between forwards and futures contracts were applicable to MGI's FX Contracts.

---

[6] MGI's FX Contracts were standardized in several key respects.  For example, they all were governed by the same Futures Customer Agreement, referenced standardized currency pairs that corresponded to FX Futures, and were all set to expire on the same date, October 23, 2008. (Declaration of E. Groothuis, dated December 1, 2014, Docket No. 43 ("Groothuis Opening Decl."), Exs. 6-7.)  Thus, similar to the manner in which FX Futures trade, MGI and LBI only negotiated price and quantity when they entered into the FX Contracts.  (*Cf.* Danza Opp. Decl. ¶ 7 (noting that the FX Contracts were standardized as to maturity dates and currency, leaving only price and quantity to negotiate); Richard Heckinger et al., Fed. Reserve Bank of Chicago, Understanding Derivatives: Markets and Infrastructure 31, https://www.chicagofed.org/~/media/publications/understanding-derivatives/understanding-derivatives-chapter-3-over-the-counter-derivatives-pdf.pdf?la=en (last visited Dec. 30, 2014) ("For exchange-traded futures and options contracts, terms are standard and negotiable only with respect to price and quantity"); *see also CFTC v. Standard Forex, Inc.*, No. CV-93-0088 (CPS), 1993 WL 809966, at *19 (E.D.N.Y. Aug. 9, 1993) ("[S]tandardization of the contracts and a margin system are characteristics of transactions in futures contracts. Here, the [defendant's] contracts are standardized (only the price varies), which facilitates the execution of offsetting transactions.") (emphasis added) (internal citations omitted).

(Trustee's Br. at 21 (citing Barnes Dep. at 37, 86-88).)  Again, Dr. Barnes was largely discussing forwards generally in response to such questions, not MGI's FX Contracts, and to the extent he was asked specifically about the MGI FX Contracts, he testified only that the contracts were bilateral, just like futures contracts, Edward F. Greene et al., U.S. REGULATION OF THE INTERNATIONAL SECURITIES AND DERIVATIVES MARKETS 12-104 (10th ed. 2012)[7], and referred to them as over-the-counter transactions.  (Barnes Dep. at 37).

The Trustee also puts significant emphasis on the fact that MGI's FX Contracts were executed off-exchange.  As stated in MGI's Opening Brief, although FX Futures typically are executed on exchanges while MGI's FX Contracts were not, this distinction does not render the two contracts dissimilar given their fundamental similarities in form, purpose and economic substance and is not dispositive of what constitutes a "commodity contract" under the Bankruptcy Code.  In fact, Section 761(4) of the Bankruptcy Code expressly provides that off-exchange contracts can qualify as commodity contracts: for example, "leverage transactions" offered by a leverage transaction merchant and "commodity options" offered by a commodity options dealer are both expressly enumerated as "commodity contracts" in section 761(4)(C) and (E) despite the fact that such transactions are not executed on exchanges or cleared by clearinghouses.  Jerry W. Markham, THE HISTORY OF COMMODITY FUTURES TRADING AND ITS REGULATION 183-184, 195-199 (1987).   Similarly, the Supreme Court has recognized the existence of legitimate, off-exchange foreign currency futures contracts.  *Dunn v. CFTC*, 519 U.S. 465, 471, 471, n.8, 474 (1997) (recognizing that the so-called "Treasury Amendment"

---

[7] *See also Leist v. Simplot,* 638 F.2d 283, 286 (2d Cir. 1980) *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S. Ct. 1825, 72 L. Ed. 2d 182 (1982) ("A commodity futures contract is simply a bilateral executory agreement for the purchase and sale of a particular commodity. The seller of the contract commits himself to deliver the commodity at a fixed date in the future, while the buyer commits himself then to accept delivery and pay the agreed price.") (internal citations omitted).

meant to exclude from CFTC jurisdiction "off-exchange foreign currency futures" and that "foreign currency…futures are now traded in the same off-exchange markets…").  Furthermore, the CFTC itself has maintained that "the requirement that a futures contract be executed on a designated contract market is … not what makes it a futures contract." *First Nat'l Monetary Corp.*, [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,698, at 30,970 (1985), available at 1985 WL 55299, *6.

The Trustee notes that the present version of 11 U.S.C. § 761, amended in 2010 by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), now divides section (4)(F) into two subparts.  The first subpart, the text of which already existed in 2008 and is what the Trustee has dubbed the "Similarity Clause," was amended in 2010 in a manner not relevant here (i.e., by adding the terms "contract" and "option").  The Trustee suggests that the new sub-part (ii), which adds "with respect to a futures commission merchant or a clearing organization, any other contract, option, agreement, or transaction, in each case, that is cleared by a clearing organization" to the commodity contract definition, somehow qualifies sub-part (i). This addition of a wholly new clause (ii) in no way clarified or qualified what the earlier version of section 761(4)(F) was intended to mean, as the Trustee argues.  Rather, by adding subpart (ii), Congress expanded subpart (F) to include certain swap contracts that may not be similar to other contracts enumerated in section 761(4) but are nonetheless cleared through FCMs.

The 2010 legislative change also demonstrates that Congress was plainly aware of the distinction between cleared and non-cleared contracts, but chose not to include any such limitation in 11 U.S.C. § 761(4)(F)(i) (2010).  Thus, the fact that MGI's FX Contracts were not executed on an exchange or cleared does not preclude the conclusion that they are sufficiently

similar to FX Futures to satisfy section 761(4)(F) (which, unlike section 761(4)(A), does not require that the contract be "subject to the rules of a contract market or board of trade").

The Trustee further argues that there is no indication in the legislative history following the Lehman collapse that Congress intended the FX Contracts to be commodity contracts. (Trustee Br. at 22.) This is beside the point given that there is no evidence that Congress intended to address this issue in any form. There is nothing in the legislative history of Dodd-Frank addressing *at all* whether contracts like MGI's FX Contracts would qualify as "commodity contracts." Dodd-Frank did not modify section 761(4)(F) in any manner that affects the issues in this case; rather, it left intact the legal basis for determining that MGI's FX Contracts were commodity contracts. In any event, the relevant version of 11 U.S.C. § 761(4)(F) is that which was in effect in 2008.

### B. The Bankruptcy Code's Definition of "Forward Contract" Does Not Preclude MGI's FX Contracts From Being "Commodity Contracts"

MGI agrees with the Trustee that the Bankruptcy Code defines "forward contract" and "commodity contract" in a manner that makes them mutually exclusive. (Trustee Br. at 13, 16.) However, the Trustee misinterprets the impact of these provisions in this case. The Bankruptcy Code's definition of a "forward contract" (11 U.S.C. § 101(25) (2008)) effectively provides that, if a contract qualifies as a commodity contract under section 761, it will be addressed under the provisions of section 761 for commodity contracts. On the other hand, contracts for the sale of a commodity with a maturity date more than two days after the date the contract is entered into that do not qualify as commodity contracts will be treated under the Code provisions designed for typical forward contracts.

As stated in the Opening Brief, "a forward contract is a contract for the sale of a commodity with a maturity date more than two days after the date the contract is entered into—

**and which isn't a commodity contract**." *In re Magnesium Corp. of Am.*, 460 B.R. 360, 370 (Bankr. S.D.N.Y. 2011) (parsing 11 U.S.C. § 101(25)) (internal quotation marks omitted) (emphasis added).  Accordingly, a contract for the sale of a commodity with a maturity date more than two days after the date the contract is entered into could qualify as a commodity contract—otherwise there would be no need for the commodity contract carve-out in the definition of forward contract.  Where a contract qualifies as a commodity contract, it is excluded from the definition of forward contract under the Bankruptcy Code to avoid overlapping defined terms.

*Magnesium Corp.'s* footnote 47 properly assumed that a "commodity contract" under sections 761(4)(B), (C), and (E) would likewise be excluded from section 101(25)(A)'s definition of "forward contract."  Footnote 47 does not refer to section 761(4)(F), which was added in 2006, because the case was addressing the pre-2006 version of the Bankruptcy Code. Nevertheless, the same logic applies, and a contract satisfying section 761(4)(F) would be excluded from the definition of a forward contract under the Bankruptcy Code.

The principle that colloquial labels given by parties to their contracts are not determinative of the legal nature of their transactions is underscored by the *Transnor (Bermuda) Ltd. v. BP North America Petroleum*, 738 F. Supp. 1472 (S.D.N.Y. 1990) line of cases discussed in MGI's Opening Brief at 12-14 and other authority.  *See Commodity Futures Trading Commission v. Noble Metals International, Inc., Moorgate Ltd., et al.,* 67 F.3d 766, 773 (Ninth Cir. 1995)* ("[S]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts]") (alterations in original).  As set forth in MGI's Opening Brief, at 17-18, the CFTC and the SEC took a similar position in one of their recent joint rulemakings.

The Trustee argues that MGI's FX Contracts fall squarely within the definition of a forward contract under 11 U.S.C. § 101(25)(A) because it contracted with LBI to buy or sell foreign currencies and the maturity date was more than two days after the trade date. (Trustee's Br. at 13.)  This reading, however, gives no effect to the definition's parenthetical carve-out "other than a commodity contract, as defined in section 761."

The Trustee's contention that MGI's FX Contracts were not commodity contracts because they were not "for delivery on, or subject to the rules of a contract market or board of trade" (Trustee's Br. at 13) is similarly flawed because MGI relies on section 761(4)(F)'s definition of a commodity contract rather than the definition contained in section 761(4)(A).[8] Further, as discussed above, contracts need not be exchange-traded or cleared in order to be commodity contracts under the Code, and the definition of a commodity contract explicitly includes contracts that are not traded on exchanges or cleared by clearinghouses.  In sum, the Trustee's argument in Part A.2 of his brief completely ignores that MGI's FX Contracts need only be *similar* to FX Futures that are captured in section 761(4)(A), not identical to them.  If there were no differences at all, MGI would rely on 761(4)(A) rather than 761(4)(F).  As a corollary, if the phrase "similar to" were read to mean "identical to," section 761(4)(F) would be superfluous.

---

[8] The Trustee mentions that the Bankruptcy Code and Part 190 Regulations draw a distinction between those for whom an entity is acting as a fiduciary to trade on exchanges and those who make bilateral trades with that entity.  (Trustee's Br. at 1).  The Trustee cites no authority for the proposition that the fiduciary relationship has any significance in determining "customer status" and, as set forth herein and in MGI's Opening Brief, at 13-14, and herein, trading on an exchange is not a determining factor for deciding whether an instrument is a "forward contract" or "futures contract" under relevant case law in this Circuit.  Further, Section 761(9)(A)(i) clearly contemplates both transactions where an FCM acts as agent and those in respect of which it acts as principal when it defines customer as an "…entity *for or with* whom such futures commission merchant deals…" (emphasis added).  Likewise, the Part 190 Regulations expressly contemplate customer protection for non-fiduciary, principal-to-principal transactions.  *See*, *e.g.*, 17 C.F.R. §§ 190.01(gg) (2008) and 190.07(e)(2) (2008).

The Trustee's citation to legislative history and a previous version of the Code is likewise unavailing.   (Trustee's Br. at 13-14.)   The Senate Report's statement that the amended "definition of 'forward contract' will eliminate the present uncertainty surrounding the use of that term in the Code," in no way supports the Trustee's (or undermines MGI's) reading of 11 U.S.C. § 101(25)(A).   S. Rep. No. 98-65, 54 (1983), 1983 WL 506599 at *70.   Rather, it supports MGI's interpretation, as the amendment does exactly what it purports to do – eliminate uncertainty, by making clear that if a contract qualifies as a commodity contract under section 761, it will be treated under subchapter IV of chapter 7 of the Bankruptcy Code.   As the Trustee concedes, the initial definition of a forward contract in then 11 U.S.C. § 101(22) also excluded a commodity contract, but did not specifically refer to section 761.   Pub. L. No. 98-353, 98 Stat. 333 § 421(j)(5).   The later addition of the clarifying reference to the definition in section 761 does not alter the analysis.

Additional legislative history cited by the Trustee also fails to preclude the possibility that what may be described colloquially as a forward contract may qualify legally as a commodity contract.   (Trustee's Br. at 14.)   The addition of the reference to section 761(8)'s definition of a commodity and the phrase "or any similar good, article, service, right or interest which is presently or in the future becomes the subject of dealing in the forward market trade," Pub. L. No. 101-311, 104 Stat. 267 § 201(1)(A) (1990), was required to clarify the meaning of the term "commodity" as well as the "scope of" certain provisions in the Bankruptcy Code relating solely to forward contracts.   Sen. Rep. 101-2851990 WL 259288, at VI.   This amendment does nothing to alter section 101(25)'s plain meaning that a contract that qualifies as a commodity contract will be addressed under section 761.

*In re Olympic Natural Gas*, 294 F.3d 737 (5th Cir. 2002), cited by the Trustee, is inapposite.  First, because the case was decided in 2002, there could be no discussion of whether the contracts at issue would meet the definition of a commodity contract under section 761(4)(F), which was added in 2006.  Second, the parties actually bought and sold the natural gas that was at issue in *Olympic*, causing the court to observe that numerous courts had held that one of the salient characteristics of a forward contract is that the parties expect to make actual delivery.  *Id*. at 739, 741.  *See also* Opening Br. at 12-15.  In this regard *Olympic* stands for MGI's point: because there was no actual (or intended) delivery under the FX Contracts in this matter, the FX Contracts lacked an essential characteristic of forward contracts.  (SOF ¶ 37; Declaration of James Danza, dated December 1, 2014, ("Danza Decl.") ¶¶ 7-8).

The Trustee's citation to other provisions of the Bankruptcy Code, 11 U.S.C. § 561 and 562 (Trustee's Br. at 15), does not in any way support his proffered conclusion that, in the face of section 101(25), a so-called forward contract can never qualify as a commodity contract. Those sections provide for an exception to the Bankruptcy Code's automatic stay for both commodity contracts and forward contracts.

The Trustee further contends that accepting that a "forward contract" is similar to a futures contract (and therefore a "commodity contract" under the Code) would violate rules of statutory construction by rendering any distinction between "forward contracts" and "commodity contracts" in the Bankruptcy Code inoperative.  (Trustee's Br. at 17).  This argument fails for several reasons.  First, MGI does not contend that all "forward contracts" are similar to futures contracts (and are thus "commodity contracts"); MGI contends merely that its FX Contracts were similar to futures contracts.  Second, the language of section 761(4)(F) does not swallow the explicit exclusion of "commodity contract" from the definition of "forward contract" in section

13

101(25)(A).   As set forth above, only a contract meeting the definition of a "commodity contract" will be excluded from the definition of a "forward contract."  Typical forward contracts between commercial participants where physical delivery is expected to, and does, take place will not qualify as commodity contracts and will therefore be treated as forward contracts under the Bankruptcy Code.  By contrast, the Trustee cannot dispute that MGI never took delivery pursuant to the FX Contracts.  (SOF ¶ 37; Danza Decl. ¶¶ 7-8).  Furthermore, as set forth in MGI's Opening Brief and also above, MGI's FX Contracts were not forward contracts under applicable law; what may be called a "forward contract" colloquially does not necessarily meet the statutory definition of that term.  (Opening Br. at 12-15, 17-18).

The legislative history cited by the Trustee for this point does not support his position. As an initial matter, H.R. 109-31(I), 121 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 183, pertains to amendments to the Federal Deposit Insurance Act and Federal Credit Union Act and has nothing to do with whether MGI's FX Contracts should be included in the definition of "commodity contract."  *Id.* at 119, 181.  Moreover, the amendments discussed were designed to expand "safe harbors" for financial contracts, such as insulation from automatic stay provisions, and do not suggest an intent to exclude MGI's FX Contracts from the commodity contract definition.  Moreover, to the extent section 761(4)(F) may have been added to avoid a later need to amend the definition of "commodity contract" as the nature and uses of certain financial instruments matured, as the Trustee suggests, this point only underscores that MGI's FX Contracts should fall within the scope of section 761(4)(F).  MGI's FX Contracts were similar to FX Futures that effected the same economic purpose and were legally equivalent to futures contracts under the law of this Circuit.  Although the Trustee suggests there was no need to add "flexibility" to the definition of "commodity contract" to accommodate "forward contracts"

given that both sorts of instruments were widely in use in 2005, the Trustee is again lumping all forwards with MGI's FX Contracts rather than addressing MGI's argument head-on and grappling with the distinctive features of MGI's FX Contracts. The Trustee's generalized statutory construction and purported historical arguments, which ignore the specific characteristics of the FX Contracts at issue in this action, are without merit.

Finally, the fact that 11 U.S.C. § 101(25)(A) also includes "any other similar agreement" within its definition does not mean, as suggested by the Trustee, that futures contracts could become forward contracts. The explicit carve-out for "commodity contracts" in section 101(25)(A) precludes such an interpretation. Thus, the Trustee's argument that MGI's interpretation of section 101(25)(A) would lead to a "farcically circular" result (Trustee's Br. At 18) is meritless. MGI's FX Contracts are "commodity contracts" and thus cannot become "forward contracts" under the similarity clause in section 101(25)(A).[9]

### C. MGI Is a "Customer" and Its Cash Balances Are "Customer Property" Under the Bankruptcy Code.

Given that MGI's FX Contracts are "commodity contracts" under 11 U.S.C. § 761(4)(F), MGI is a "customer" under 11 U.S.C. § 761(9)(A)(ii)(II) (2008). Moreover, MGI's Net Cash Balances constitute "customer property" under 11 U.S.C. § 761(10)(A)(i) (2008), as the Trustee does not dispute that the Net Cash Balances were posted as margin for MGI's FX Contracts.[10]

---

[9] The legislative history for section 101(25)(A) states that "the term 'similar' is intended to be interpreted broadly to include items similar in nature or traded in a manner similar to those commodities included in the CEA definition." S. Rep. No. 101-285 (1990), 1990 WL 259288, at VI. The term "similar" within section 761(4)(F) should be read broadly as well.

[10] Notably, Jonathan Williams, a senior vice president in LBI's commodities and futures division during the relevant time period, testified that LBI often engaged in FX transactions under ISDA agreements and that a bank or institutional counterparty under such ISDA agreements would often not be required to post initial margin. (Groothuis Opp. Decl. Ex. 3 (Williams Dep. Tr. at 8-9, 17-18).) Here, by contrast, LBI executed FX Contracts with MGI under the Futures Customer Agreement and required MGI to post initial and variation margin

MGI and its Net Cash Balances therefore fall squarely within the scope of the relevant customer

asset protection provisions of the Bankruptcy Code.

## II.   THE FUTURES CUSTOMER AGREEMENT IS A COMMODITY CONTRACT UNDER SECTION 761(4)(J)

11 U.S.C. § 761(4)(J) defines "commodity contract" to include:

> any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this paragraph, including any guarantee or reimbursement obligation by or to a commodity broker or financial participant in connection with any agreement or transaction referred to in this paragraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.

The Futures Customer Agreement expressly authorized MGI to trade futures contracts.

Therefore, even if MGI's FX Contracts were not commodity contracts, MGI would still be a

"customer" because the Futures Customer Agreement is an agreement that is related to

commodity contracts, provides security arrangements for such contracts, and includes

reimbursement obligations by and to LBI as a commodity broker.  Although MGI raised this

argument previously in its pre-motion letter to this Court, the Trustee chose not to address this

point in his papers.

## III.   SIPA'S DEFINITION OF "CUSTOMER" IS NOT CONTROLLING BECAUSE LBI WAS JOINTLY REGISTERED AS AN FCM

The Trustee argues that MGI does not meet the definition of a securities "customer"

under SIPA.  (Trustee's Br. at 11-12) (citing 15 U.S.C. § 78lll(2).)  MGI, however, does not

contend that it is a securities customer under SIPA since it does not have a claim on account of

securities.  15 U.S.C. § 78lll(2).  In leading with this point, the Trustee suggests that the

---

equivalent to the margin it would require for FX Futures.  (*See id.* at 19; Opening Br. at 3; SOF ¶ 36).

definition of "customer" in 15 U.S.C. § 78lll(2) is dispositive in this case, when in fact it is irrelevant.

What the Trustee cannot ignore, and indeed concedes, is that LBI was registered as an FCM in addition to being a broker-dealer, and thus the Trustee is required to apply the commodity broker liquidation provisions of the Bankruptcy Code, 11 U.S.C. §§ 761-767 (Trustee's Br. at 11), in addressing MGI's Claims.  As discussed above, the definitions of both "customer" and "customer property" in the Bankruptcy Code provisions concerning FCMs are satisfied by the proper analysis of MGI's Claims.  In addition the fact (as conceded by the Trustee (*id*. at 9)) that MGI's Cash Balances were required to be, and were in fact, included in LBI's Rule 15c3-3 calculation renders them "customer property" under the Bankruptcy Code (Opening Br. at 19), which is further support for MGI's protected customer status.  All of the cases cited by the Trustee in support of its arguments under SIPA and Rule 15c3-3, *In re Lehman Bros. Inc.*, 474 B.R. 139, 148 (Bankr. S.D.N.Y. 2012), *In re New Times Sec. Servs.*, *Inc*., 463 F.3d 125, 130 (2006), *SEC v. Baroff*, 497 F.2d 280, 282, n2. (2d Cir. 1973), *In re Bernard L. Madoff Investment Secs. LLC*, 654 F.3d 229 (2d Cir. 2011), and *In re Omni Mut., Inc.*, 193 B.R. 678, 681-82 (S.D.N.Y. 1996), are inapposite for various reasons (as further discussed below), but principally because they do not deal with FCM customers like MGI in this case.

The Trustee's narrow and misplaced focus on a nexus to securities transactions ignores LBI's dual registration as both a broker-dealer and an FCM.  As SIPA itself expressly directs the Trustee to apply Subchapter IV, Chapter 7 of Title 11, to the FCM portion of LBI's estate, it simply is not the case that the SIPA definition of "customer" trumps all.[11]

---

[11] The importance of this point to the industry at large cannot be understated.  No fewer than 43 of the 50 largest CFTC-registered FCMs are jointly registered as broker-dealers with the SEC.

**IV.** **MGI IS ENTITLED TO CUSTOMER STATUS BY VIRTUE OF LBI'S INCLUSION OF MGI'S FUNDS IN LBI'S 15c3-3 CALCULATION**

MGI's Gross Cash Balances were, by the Trustee's own admission, included in LBI's calculation under Rule 15c3-3, the SEC's customer asset protection rule designed to safeguard customer assets within its scope in the event of the insolvency of a broker-dealer registered with the SEC like LBI. LBI nevertheless argues, incorrectly, that Rule 15c3-3 is irrelevant since only SIPA determines who is entitled to customer treatment. (Trustee Br. at 24.)

The Trustee cites to *In re Lehman Bros. Inc.*, 474 B.R. 139, 148 (Bankr. S.D.N.Y. 2012), in support of its argument that Rule 15c3-3 has no bearing here, but that inapposite case concerned "soft dollar" claims. "Soft dollars" are not actual funds but commission credits that may be used to purchase research and brokerage services that fall within the parameters of 15 U.S.C. § 78bb(e). 474 B.R. at 142. As such, and as the court repeatedly emphasized, they are not "cash equivalents" or "unrestricted cash that can be spent freely." *Id.* at 141. Thus, the "soft dollars" at issue in that opinion are easily distinguishable from MGI's Net Cash Balances. Furthermore, Judge Peck did not deal with the implications of the larger issue presented here: namely, the perceived gap between the definitions of "customer" under Rule 15c3-3 and SIPA.

---

*See* Selected FCM Financial Data as of October 31, 2014, *available at* http://www.cftc.gov/ucm/groups/public/@financialdataforfcms/documents/file/fcmdata1014.pdf. If a trustee in the liquidation of a jointly registered broker-dealer/FCM were permitted to disregard the customer asset protections extended to FCM customers under the Code and CFTC rules based on the securities focus of the definition of "customer" under SIPA, SIPA's express direction to apply the Code's commodity broker liquidation provisions to claims of FCM customers would be meaningless. Even the Trustee in this case has recognized his duty to apply the commodity broker liquidation provisions appropriately (notwithstanding the securities-focused definition of customer in SIPA) in the liquidation of MF Global, Inc., a jointly registered broker-dealer/FCM that failed in 2011. *See In re MF Global Inc.*, 2012 WL 2202973, at *1-2 (Bankr. S.D.N.Y. June 14, 2012) (noting that Trustee had set up a commodities claim process and a securities claim process and stating that "determining the claims of, and allocating customer property to, former MFGI commodity customers incorporates the interplay of subchapter IV of title 11 of the Bankruptcy Code, the CEA, and 17 C.F.R. Part 190").

The additional cases cited by LBI, *In re New Times Sec. Servs.*, *Inc.*, 463 F.3d 125, 130 (2006), and *SEC v. Baroff*, 497 F.2d 280, 282, n2. (2d Cir. 1973), *In re Bernard L. Madoff Investment Secs. LLC*, 654 F.3d 229 (2d Cir. 2011), and *In re Omni Mut., Inc.*, 193 B.R. 678, 681-82 (S.D.N.Y. 1996), are similarly inapposite. Both *New Times* and *Baroff* concerned claimants who were deemed "lenders" in that they had granted the debtor the right to use their (in the case of *New Times*, imaginary) funds or securities. 463 F.3d at 130; 497 F.2d at 281, 284. *Madoff* predominately concerned the method of calculating the customers' net equity, although the court also concluded that the claimants were customers, a point the parties did not dispute even though the funds they deposited were never used to purchase securities. 654 F.3d at 236. *In re Omni Mut.*, *Inc*. concerned whether an interest in a limited partnership was a security, and has no bearing on the question here. 193 B.R. at 679.

Notably, the Trustee does not cite any support for his ultimate conclusion that "[t]he customer protection rules broker-dealers and FCMs use to calculate reserves required to comply with CFTC and SEC regulations do not create individual entitlements for MGI or other Lehman clients in the bankruptcy." (Trustee's Br. at 22.) This conclusion reveals a critical flaw in his argument: what would be the point of a customer protection rule if it did not protect customers within its ambit at the point in time when they actually need protection? **To accept the Trustee's position would mean that assets of customers expressly protected under Rule 15c3-3 are not recoverable by such customers unless they also meet the narrower definition of customer under SIPA, absent which their assets may be used to subsidize the recovery of SIPA customers. This cannot be the result intended by Congress and the SEC.**

The Trustee has also suggested that the inclusion of MGI's Cash Balances in the 15c3-3 reserve calculation is somehow rendered meaningless because it had sufficient assets at

19

permitted control locations offset its obligations with respect to the non-regulated commodity credits. (Trustee's Br. at 9-10.)  If this were the case, all that would mean is that LBI was not required to deposit additional funds in the Special Reserve Account because all 15c3-3 customer funds were otherwise adequately protected (e.g., because the funds were held at permitted control locations like clearinghouses from which LBI could readily collect them).  Put in terms of the Rule, because assets sufficient to cover the non-regulated commodity credits had been placed by LBI at permitted control locations or were already segregated as customer balances, including amounts segregated under CFTC rule 30.7, customer assets were deemed fully protected, thereby obviating the need to deposit additional funds in the Special Reserve Account. (Trustee's Br. at 6, 7, 10; *see also* Trustee's December 1, 2014, Rule 56.1 Statement, ¶ 83; Groothuis Opening Decl. Ex. 9 (Rodriguez Dep. Tr. at 190:22-24).)  Once LBI collected the balances from permitted control locations, it would have, together with the customer funds already segregated, the funds necessary to pay out all customers with credits, like MGI, under the 15c3-3 calculation.  The Trustee's suggestion, therefore, that if none of MGI's funds could be traced into the Special Reserve Account, MGI would not be entitled to customer asset protection, misrepresents the manner in which Rule 15c3-3 protects customer assets.[12]

## V.    MGI WOULD BE ENTITLED TO CUSTOMER PROTECTION EVEN HAD THE TRUSTEE APPLIED THE PART 190 REGULATIONS

### A.  The Trustee Never Administered an FCM Estate or Applied the Part 190 Regulations

The Trustee admittedly failed to administer an FCM estate pursuant to the Part 190 Regulations, but nevertheless contends that MGI's Cash Balances were not protected under the

---

[12] Further, the Trustee's argument assumes Spreadsheet 1712 is accurate in showing no additional funds needed to be deposited into the Special Reserve Account, a point MGI does not concede.  (*See* Claimant's Response to Trustee's 56.1 Statement ¶ 83.)

Part 190 Regulations because there is no category therein for "forward accounts." (Trustee's Br. at 22-23). The Trustee is mistaken. First, given that the Trustee never administered an FCM estate or applied the Part 190 Regulations himself, it is disingenuous to suggest that MGI's Cash Balances would not have fit into an account class he never created under regulations he never applied. Second, as discussed above, MGI's claims are for MGI's Net Cash Balances that were previously posted as margin in connection with commodity contracts, not forward contracts. Third, because MGI's Cash Balances are protected under SEC Rule 15c3-3, they are shielded *via* a separate statutory trust on equal footing with the protections created under CFTC regulations. *Grede v. FCStone, LLC*, 746 F.3d 244, 258-259 (7th Cir. 2014) (where two pools of statutory trust were created, one protected by the Commodity Exchange Act and related CFTC regulations and the other protected by the Investment Advisers Act and related SEC regulations, and where the claimants in the pools were battling over an insufficient pool of commingled funds, "there is no legal basis for placing one trust ahead of the other, despite FCStone and the CFTC's attempts to argue otherwise").

### B. The Part 190 Regulations Support MGI's Position in Any Event

#### 1. MGI Is a "Customer" and Its Net Cash Balances Are "Customer Property" Under the Part 190 Regulations

17 C.F.R. § 190.01(g) (2008) defines "commodity contract" to have the same meaning as that set forth in 11 U.S.C. § 761(4). "Customer" under 17 C.F.R. § 190.01(k) (2008) has the same meaning as that set forth in 11 U.S.C. § 761(9). MGI's Net Cash Balances are "customer property" under the Part 190 Regulations as well because 17 C.F.R. § 190.08(a)(1)(i)(A) (2008) is worded nearly identically to 11 U.S.C. § 761(10)(A)(i), which captures MGI's Net Cash Balances as customer property for the reasons set forth above and in MGI's Opening Brief.

Accordingly, for the reasons set forth herein and in MGI's Opening Brief, MGI is a "customer" and its assets are entitled to customer protection under the Part 190 Regulations.

### 2.   MGI's Cash Balances Were "Segregated" On The Filing Date

Although MGI does not believe it is necessary for the Court to reach this point in light of the customer protection afforded to MGI's Cash Balances under Rule 15c3-3 and the Bankruptcy Code, MGI's Cash Balances would also be "customer property" pursuant to 17 C.F.R. § 190.08(a)(1)(ii)(A) (2008), which defines "customer property" to include:  "(ii) All cash, securities, or other property which: (A) Is segregated on the filing date."

It is undisputed that MGI's funds were sent from MGI into a segregated bank account denominated as a "Lehman Brothers Inc. Customer Segregated Commodity Funds Account" at an unaffiliated financial institution, JP Morgan Chase, at LBI's direction, a point Mr. Rodriguez acknowledges in his declaration, at ¶¶ 15-17.  (*See also* SOF ¶ 14-16.)  No witness or document could confirm whether MGI's funds were ever removed from that segregated account.  Mr. Rodriguez testified that once he instructed LBI's treasury group to effect a net transfer of funds from a segregated or secured account pursuant to a regulatory calculation, it was up to that group to decide where to move the funds, and he could not say that MGI's funds were ever removed from a segregated environment.  (Groothuis Opp. Decl. Ex. 1 (Rodriguez Tr. at 92), *see also id.* at 224-25.)

Further, as the Trustee admits, changes in the designation of MGI's funds from "segregated" to "non-segregated" on account statements were merely indicative of "book entries" and "did not represent actual cash movements at Lehman's third-party financial institution."  (Trustee's Br. at 8).  What is more, there is no indication that a book entry reflecting a change to "non-segregated" status meant that such funds would have been mixed with LBI's

22

proprietary assets.   To the contrary the "non-segregated" portion of the futures account statements included funds that were protected and held separate from LBI's proprietary funds. (*See, e.g.*, Groothuis Decl. Ex. 11 (Kobak Tr. at 16 (MGI's funds were held in the "unsegregated account, which includes . . . the accounting for funds that would be held pursuant to Rule 30.7 for trading on foreign exchanges[13] and is also where FX and other noncommodity funds were recorded.")   Mr. Rodriguez confirmed that LBI did not commingle assets in the "non-regulated" account referenced in the Client Asset Protection Overview with LBI's proprietary funds. (Groothuis Opp. Decl. Ex. 1 (Rodriguez Tr. at 40).)   Most importantly, he did not know whether MGI's funds were in an account mixed with LBI's proprietary funds on the Filing Date.   (*Id.* (Rodriguez Tr. at 44).)   Indeed, Mr. Rodriguez was no longer employed by LBI as of the Filing Date, his employment having been terminated in August 2008.   (Rodriguez Decl. ¶ 2.)

Similarly, the Trustee's 30(b)(6) witness could not say whether LBI used any of the funds transferred out of its 4(d) "segregated" account in its own operations, nor could he confirm that MGI's funds were not held in the special reserve account mandated by Rule 15c3-3, with which the Trustee's 30(b)(6) witness stated LBI was complying, and which would mean that MGI's funds could not have been commingled with LBI's proprietary funds.   (Groothuis Opp. Decl. Ex. 2 (Kobak Tr. at 30-31, 37, 54-57).)   Accordingly, at the very least, there is an issue of fact as to whether MGI's Cash Balances were segregated from LBI's proprietary funds on the Filing Date, which requires denial of the Trustee's Motion to the extent that the Court concludes that whether or not MGI's Net Cash Balances were segregated as of the Filing Date is relevant to the disposition of MGI's Claims.

---

[13] An FCM is required to hold customer funds and collateral pledged in relation to foreign Futures Contracts separate and apart from the FCM's own funds in what is referred to as a "secured" account under CFTC Regulation 30.7. (17 C.F.R. § 30.7.)

### 3. MGI Is a Customer Because Its Claims Are Not "Solely on Account of a Forward Contract"

The Trustee also argues that the Part 190 Regulations specifically exclude from the definition of "customer" an entity that holds a claim solely on account of a forward contract, citing 17 C.F.R. § 190.10(e) (2008).  (Trustee's Br. at 15.)[14]  However, MGI is solely claiming Net Cash Balances, not contracts,[15] and these cash balances relate to margin posted in connection with its FX Contracts, which were not forward contracts under the applicable law for the reasons stated above.

### 4. MGI Is Claiming Customer Property, Not Forward Contracts

The Trustee argues that 17 C.F.R. § 190.08(a)(2)(iii) (2008) excludes "forward contracts" from the definition of "customer property."  (Trustee's Br. at 16).  Again, however, MGI's claims are not for a contract of any description.  Instead, MGI's claims are for the cash balances resulting from the margining of MGI's FX Contracts, which were commodity contracts and not forward contracts under the Code.

The Trustee contends that the CFTC's pronouncement that it "believes that a forward contract is a contract which is not a commodity contract, which is a defined term and thus no further definition is required," 48 Fed. Reg. 8716, 8738 (Mar. 1, 1983), somehow means MGI's FX Contracts cannot be commodity contracts.  (Trustee's Br. at 16).  This argument fails for all

---

[14] The Part 190 Regulations do not define "forward contract" but do define commodity contract by reference to Section 761 of the Bankruptcy Code.  By extension, the definition of "forward contract" in section 101(25) of the Code should apply.

[15] Section 761(9)(A) of the Bankruptcy Code makes this distinction, since, in defining customer, it differentiates between claims "on account of a commodity contract," 11 U.S.C. § 761(9)(A)(i), and claims "arising out of" margin posted in connection with such contracts.  11 U.S.C. § 761(9)(A)(ii) (2008).  MGI's claims are based solely upon the latter.

the same reasons the Trustee's identical argument with respect to section 101(25) does.  Further, it is irrelevant since MGI's FX Contracts were not forward contracts as a legal matter.

Accordingly, MGI's Net Cash Balances are entitled to customer asset protection under the Part 190 Regulations.

## VI.   MGI'S NET CASH BALANCES ARE NOT PROPERTY OF THE ESTATE

Although MGI has repeatedly argued that the Trustee has no greater right to MGI's Net Cash Balances than pre-petition LBI had, and that LBI was prohibited by the Futures Customer Agreement and SEC regulation from using MGI's funds, the Trustee has made no effort to demonstrate any entitlement to what he admits were MGI's funds.  (*E.g.*, Trustee's Rule 56.1 Statement ¶ 43).  Accordingly, since LBI does not have any legal or equitable right to MGI's Net Cash Balances, the Trustee cannot deem the Net Cash Balances to be property of the estate that is available for distribution to other customers or general creditors of LBI.  (*See* Opening Br. at 23-25.)[16]

### CONCLUSION

For the foregoing reasons, the Trustee's Motion should be denied.

---

[16] The Trustee acknowledges that "Lehman was not a depository bank."  (Trustee's Br. at 8, n. 7).  In doing so, the Trustee admits that MGI's Net Cash Balances were not placed "on deposit" with LBI, in which case LBI might owe only a simple debt to MGI in respect of the funds.  Even if LBI transferred them to its general funds accounts in violation of the express terms of the Futures Customer Agreement and SEC Rule 15c3-3, MGI's Net Cash Balances still belong to MGI and must be returned to MGI.

Dated: New York, New York
      December 30, 2014

                                      **Respectfully Submitted**,
                                        **SCHLAM STONE & DOLAN LLP**

By:    __/s/_____
                    Jeffrey M. Eilender
                    Erik S. Groothuis
                    Samuel L. Butt
                    26 Broadway
                    New York, NY 10004
                    Telephone No.: (212) 344-5400
                    Facsimile No.: (212) 344-7677
                    E-Mail: jme@schlamstone.com
                    E-Mail: egroothuis@schlamstone.com
                    E-Mail: sbutt@schlamstone.com

                    **OF COUNSEL**

                    Lauren Teigland-Hunt
                    Teigland-Hunt LLP
                    127 West 241h Street, 4th Floor
                    New York, NY 10011
                    (212) 269-1600
                    lth@t-hllp.com

                    *Attorneys for*
                    *Moore Capital Management, L.P.*