USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/17/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re

LEHMAN BROTHERS INC.,

Debtor.

MOORE CAPITAL MANAGEMENT, LP, on behalf of MOORE GLOBAL INVESTMENTS, L.P.,

Claimant,

- against -

JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.,

Debtor.

OPINION AND ORDER

14-cv-00535(SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

Before the Court are cross-motions for summary judgment in a dispute over the status of the claims asserted by Moore Capital Management, LP, on behalf of Moore Global Investments, L.P. ("MGI"), against the estate of

Lehman Brothers Inc. (“LBI”). In addition, the Commodity Futures Trading Commission (“CFTC”) has filed an *amicus curiae* brief urging this Court to deny MGI the “customer” status it seeks.[1]

On September 19, 2008, LBI was placed into liquidation under the Securities Investor Protection Act (“SIPA”) of 1970, and James W. Giddens was appointed Trustee.[2] SIPA governs the liquidation of broker-dealers that are registered with the Securities Exchange Commission (“SEC”). In addition to having the general duties and powers of a bankruptcy trustee, a SIPA trustee is charged with recovering “customer property” — *i.e.*, the cash and securities held in brokerage accounts — which is then pooled and distributed to “customers” pro rata.[3] With respect to LBI’s brokerage business, the Trustee has satisfied in full all undisputed customer claims, and has also made significant distributions to general unsecured creditors.

---

1 The CFTC’s views, while not controlling, merit deference. *See CFTC v. Schor*, 478 U.S. 833, 844 (1986).

2 15 U.S.C. §§ 78aaa-78lll. SIPA liquidations are referred to the Bankruptcy Court. On MGI’s motion, I withdrew the reference with respect to the dispute over the status of MGI’s claim.

3 *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, --- F.3d ----, 2015 WL 727965, at *2 (2d Cir. Feb. 20, 2015) (“In a SIPA liquidation, a fund of customer property, separate from the broker-dealer’s general estate, is established for priority distribution exclusively among customers.”).

Prior to being placed into liquidation, LBI was also a commodity broker registered as a futures commission merchant ("FCM") with the CFTC. When a debtor operates as both a broker-dealer and a commodity broker, SIPA trustees are authorized to administer the commodity broker estate — separate from the SIPA estate — in accordance with the Bankruptcy Code's commodity broker liquidation provisions, subchapter IV of chapter 7 ("subchapter IV").[4]

Subchapter IV provides that "customers" of a commodity broker business are entitled to receive a pro rata distribution from "customer property." Customer property is defined as "cash, a security, or other property, or proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the account of a customer."[5] Under subchapter IV,

---

4 *See, e.g.*, 15 U.S.C. § 78fff-1(b) (stating that "[t]o the extent consistent with the provisions of [SIPA] or as otherwise ordered by the court, a [SIPA] trustee shall be subject to the same duties as a [Chapter 7] trustee in a case under chapter 7 of [the Bankruptcy Code], including, if the debtor is a commodity broker, as defined under section 101 of such title, the duties specified in subchapter IV of such chapter 7").

5 11 U.S.C. § 761. Subchapter IV is supplemented by the Commodity Exchange Act ("CEA") and the "Part 190 Rules" promulgated by the CFTC thereunder. *See* 7 U.S.C. § 1 *et seq.* 17 C.F.R. §§ 190.01-190.10. Because "[t]he CEA and the Part 190 Rules supplement and supersede the commodity broker liquidation subchapter in many respects, [ ] the commodity broker liquidation subchapter [ ] must be read in conjunction with the CEA and the Part 190 Rules." Collier on Bankr. ¶ 760.01.

"customer" status hinges on whether a creditor's claim is on account of a "commodity contract," as defined by section 761(4).

Thus, in a liquidation of a broker-dealer that was also a commodity broker, separate pools of customer funds are created for broker-dealer and commodity broker customers. In this case, the Trustee has not separately administered an estate under subchapter IV because LBI's exchange-traded derivatives business was sold to Barclays Capital Inc. on September 22, 2008, and there have been no valid customer claims asserted against the estate.[6] However, MGI contends that it is entitled to "customer" status because its claim against LBI is on account of funds held by LBI to margin commodity contracts.

The Trustee does not deny that MGI has a claim against the estate. But the Trustee argues that the transactions giving rise to MGI's claim — over-the-counter ("OTC") foreign exchange contracts ("OTC FX Contracts") in which LBI and MGI were counterparties — are "forward" contracts that do not qualify as commodity contracts under subchapter IV. Accordingly, the Trustee argues that

---

[6] *See, e.g.*, *In re Lehman Bros. Inc.*, 478 B.R. 570, 575-78 (S.D.N.Y. 2012), *aff'd*, 761 F.3d 303 (2d Cir. 2014). This included "$2 billion of [ ] customer property held as margin for futures positions of LBI's customers, along with additional customer property held as margin for the options positions of customers." *Id.* at 578 (quotation marks and brackets omitted).

MGI is not entitled to customer status and is instead a general unsecured creditor. For the following reasons, the Trustee's motion is GRANTED to the extent of confirming its determination that MGI's claim is not entitled to customer status, and MGI's motion is DENIED. Further proceedings are necessary to determine whether the funds used to margin the OTC FX Contracts are property of the estate.

## II. BACKGROUND[7]

In January 2003, MGI and LBI entered into a Master Institutional Futures Customer Agreement (the "Customer Agreement"), which resulted in the opening of two accounts.[8] The Customer Agreement permitted MGI to trade both OTC FX Contracts and exchange-traded futures contracts.[9]

Under paragraph 2 of the Customer Agreement, MGI "agree[d] to

---

[7] The facts are drawn from the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto. These facts are undisputed unless otherwise noted. Where disputed, the facts are viewed in the light most favorable to the nonmoving party. *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

[8] *See* Claimant's Rule 56.1 Statement ("MGI 56.1") ¶ 6 (citing Futures Customer Agreement, Ex. A to 12/1/14 Declaration of James Danza, Treasurer of MGI.

[9] *See id.* ¶ 8. The Trustee admits this but states that "MGI [n]ever intentionally traded futures contracts on an exchange through [LBI.]" Trustee's Response to Claimant's Statement of Facts Pursuant to Local Rule 56.1 ¶ 8.

maintain such collateral and/or margin in its account as LBI in its reasonable discretion may require." Paragraph 5 states that "[a]ll Contracts and other Property belonging to [MGI] which LBI . . . may at any time be carrying for [MGI] or holding in its . . . possession or control on behalf of [MGI] for any purpose, including safekeeping, shall be held by LBI as security and be subject to a general lien and right of setoff for the discharge of all liabilities and obligations of [MGI] owed to LBI . . ."

MGI booked OTC FX Contracts in its accounts between 2003 and the commencement of LBI's liquidation in September 2008.[10] In addition, "[a]t least thirteen [f]utures [c]ontracts were booked into one of the MGI Accounts, each of which was subsequently reversed."[11] At the time LBI was placed into liquidation, MGI had approximately thirty open OTC FX Contracts as well as cash balances.[12]

In the year preceding LBI's collapse, MGI became concerned about a possible default by LBI and the implications of such a default for customer assets held by LBI. During this period, MGI asked for, and received, "assurances that the

---

[10] *See* MGI 56.1 ¶ 19.

[11] *Id.* ¶ 20.

[12] *See id.* ¶ 43.

assets of LBI customers like MGI would be protected in the event of LBI's insolvency."[13] Zurma Vargas, a director in LBI's futures department, told MGI representatives during phone conversations from late 2007 through September 2008, that MGI's funds would be protected.[14] MGI claims, but the Trustee disputes, that "[w]ith respect to cash that was margining MGI's [OTC] FX Contracts, Ms. Vargas told MGI that those funds would be protected because they were held in a futures account."[15]

LBI never provided MGI with a written statement pursuant to SEC Rule 15c3-2 (2008).[16] A document sent by LBI to its customers entitled "Client Asset Protection Overview" informed customers that LBI, as an FCM, was required to maintain three types of customer fund accounts: a "Segregated Funds" account; a "Secured Amount Funds" account; and a "Non-Regulated Funds" account.[17] The description of the "Non-Regulated Funds" account provided that "[t]he assets held in this account can not [sic] be commingled with LBI's

---

13 *Id.* ¶ 22. Moore disputes that LBI provided any assurances specifically regarding MGI, rather than Moore generally, or that the assurances referred to or related to foreign currency forwards.

14 *See id.* ¶ 23.

15 *Id.* ¶ 24.

16 *See id.* ¶ 27.

17 *Id.* ¶ 28.

proprietary funds and are maintained in a designated Special Custody Account for the 'Exclusive Benefit of Customers (EBOC Account)[’] held at Chase."[18] The overview further provided that "creditors of LBI's bankruptcy estate would have no claim to any of the assets held in these three accounts," and that "the assets held in these accounts at Chase do not fall within the bankrupt estate and are reserved for payments to customers if LBI would ever file for bankruptcy."[19]

MGI's OTC FX Contracts and exchange-traded foreign exchange futures ("FX Futures") are both agreements to buy or sell currency in the future at a pre-determined rate and call for physical delivery of the underlying currencies at maturity. Positions in both contracts can be closed out early by offsetting contracts, in which case any gains or losses will be settled in cash without physical delivery of the underlying currencies. In addition, both types of contracts present counterparty credit risk. MGI was exposed to LBI's credit risk when engaging in the OTC FX Contracts. Had it traded FX Futures, MGI would have been exposed primarily to the credit risk of a clearinghouse such as the Chicago Mercantile Exchange.[20]

---

[18] *Id.* ¶ 29 (quotation marks omitted) (alterations in original).

[19] *Id.* ¶ 30 (quotation marks omitted).

[20] *See id.* ¶¶ 32-34.

LBI required MGI to post margin on the OTC FX Contracts. MGI entered into the OTC FX Contracts to hedge currency fluctuation risk. Whenever MGI needed to decrease one of the hedging positions it had in the MGI Accounts, MGI and LBI would enter into an offsetting FX Contract to decrease the net open position.[21]

Pursuant to protocols issued by the Trustee, the OTC FX Contracts were deemed terminated as of the commencement of LBI's liquidation. MGI had outstanding gross cash balances in its accounts of $70,576,023.06 and $6,055,385.09. Upon termination of the OTC FX Contracts, $59,179,357.27 and $5,320,485.94 was owed to LBI in respect of the OTC FX Contracts in each account, reflecting the values of the contracts in favor of LBI. The remaining $11,396,647.79 and $734,899.15 (the "Net Cash Balances"), respectively, represent the excess cash margin held by LBI.[22]

It is this money — roughly twelve million dollars — as to which MGI seeks preferred customer status. On January 27, 2009, MGI filed two customer claims seeking the Net Cash Balances. After the Trustee denied the claims and reclassified them as general creditor claims, MGI filed an objection, asserting it

---

[21] *See id.* ¶¶ 36-38.

[22] *See id.* ¶¶ 46-48.

was entitled to customer status.[23]

## III. LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law.'"[24] "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[25]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[26] To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the

---

23 *See* Trustee's Rule 56.1 Statement ¶¶ 6-11.

24 *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted). *Accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

25 *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotation marks omitted).

26 *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

material facts,"[27] and "may not rely on conclusory allegations or unsubstantiated speculation."[28]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[29] "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[30]

## IV. APPLICABLE LAW

### A. Derivatives, the Commodities Exchange Act, and the CFTC

#### 1. Common Law Treatment of Derivatives

"Derivatives" can be defined as "complex financial contracts in which one party pays another party if 'something' happens in the future . . . ."[31] One

---

[27] *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[28] *Id.* (quotation marks and citations omitted).

[29] *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[30] *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

[31] Colleen M. Baker, *Regulating the Invisible: The Case of Over-The-Counter Derivatives*, 85 Notre Dame L. Rev. 1287, 1299 (2010).

early use of derivatives in the United States was "forward contracting" in which farmers would hedge against price fluctuations in agricultural products by setting price terms in advance, with delivery of the product in the future.[32] Not surprisingly, "[t]he opportunity to make a profit as a result of fluctuations in the market price of commodities covered by contracts for future delivery motivated speculators to engage in the practice of buying and selling 'futures contracts'" even though they had no interest in the underlying commodity.[33]

Under the common law, courts would not enforce speculative futures contracts, although they were not illegal *per se*.[34] Speculators solved the enforcement problem by trading futures contracts in private venues — commodity exchanges — whose members guaranteed performance. In *Board of Trade of*

---

[32] *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982).

[33] *Id.*

[34] *See Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) ("The generally accepted doctrine in this country is . . . that a contract for the sale of goods to be delivered at a future day is valid, even though the seller has not the goods, nor any other means of getting them than to go into the market and buy them; but such a contract is only valid when the parties really intend and agree that the goods are to be delivered by the seller and the price to be paid by the buyer; and if, under guise of such a contract, the real intent be merely to speculate in the rise or fall of prices, and the goods are not to be delivered, but one party is to pay to the other the difference between the contract price and the market price of the goods at the date fixed for executing the contract, then the whole transaction constitutes nothing more than a wager, and is null and void.").

*Chicago v. Christie Grain & Stock Co.*,[35] the Supreme Court gave legitimacy to exchange traded derivatives. While the contracts were not settled by actual delivery, their standardized terms enabled them to be settled by set-off.[36] The Supreme Court found that, "[s]et-off has all the effects of delivery."[37] Meanwhile, OTC trading — unless it involved actual or forward delivery — remained illegal.

**2. The Commodity Exchange Act and the CFTC**

Prior to 2000, the upshot of then-sections 4, 4b, and 4h of the CEA was that most domestic commodities contracts were required to be executed on a regulated commodities market. This meant that, consistent with the common law, most OTC derivatives were illegal.[38] Accordingly, the CFTC's regulatory focus

---

[35] 198 U.S. 236 (1905).

[36] *See Curran*, 456 U.S. at 358 ("At such exchanges standardized agreements covering specific quantities of graded agricultural commodities to be delivered during specified months in the future were bought and sold pursuant to rules developed by the traders themselves. Necessarily the commodities subject to such contracts were fungible. For an active market in the contracts to develop, it also was essential that the contracts themselves be fungible. The exchanges therefore developed standard terms describing the quantity and quality of the commodity, the time and place of delivery, and the method of payment; the only variable was price.").

[37] *Christie Grain & Stock Co.*, 198 U.S. at 248.

[38] *See* Lynn A. Stout, *Why the Law Hates Speculators: Regulation and Private Ordering in the Market for OTC Derivatives*, 48 Duke L. J. 701, 722-23 (1999) (stating that prior to 2000 "[t]he CEA resemble[d] the common law because it prohibit[ed] all contracts of sale for future delivery that are not made on, and

was on exchange-traded or other cleared "transactions involving contracts of sale of a commodity for future delivery . . . ."[39]

But whether executed by an FCM or not, certain types of commodity transactions are not subject to CFTC regulation. Forward contracts and spot contracts — which are contracts for "the immediate sale and delivery of a commodity"[40] — were not regulated. In 1992, OTC "swaps" — "agreement[s] between two parties to exchange a series of cash flows measured by different interest rates, exchange rates, or prices with payment calculated by reference to a

---

subject to the rules of, an organized exchange. This prohibition does not apply, however, to contracts that are intended to be settled by delivering the underlying good or service. The net result is that trading in futures and options that are not intended to be settled by delivery is legally permissible only within the safe harbor of a regulated exchange. Off-exchange 'difference contracts' are not just unenforceable, but illegal under federal law."). "An option, as the term is understood in the trade, is a transaction in which the buyer purchases from the seller for consideration the right, but not the obligation, to buy or sell an agreed amount of a commodity at a set rate at any time prior to the option's expiration." *Dunn v. CFTC*, 519 U.S. 465, 469 (1997).

[39] 7 U.S.C. § 2(a)(1)(A).

[40] *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993). In contrast to futures, with forwards and spots, "it is [generally] not possible to close a position by buying a traded offset, because promises are not fungible; delivery is idiosyncratic rather than centralized." *CFTC v. Zelener*, 373 F.3d 861, 866 (7th Cir. 2004).

principal base"[41] — and other hybrid derivatives were exempted from regulation.[42] And, as a result of the 1975 "Treasury Amendment," OTC foreign currency exchange contracts are not subject to regulation:

> Nothing in this chapter shall be deemed to govern or in any way be applicable to transactions in foreign currency, security warrants, security rights, resales of installment loan contracts, repurchase options, government securities, or mortgages and mortgage purchase commitments, *unless such transactions involve the sale thereof for future delivery conducted on a board of trade*.[43]

In 2000, Congress enacted the Commodities Futures Modernization Act, which lifted the CEA's ban on OTC derivative products at least when eligible contract participants ("ECPs") — *e.g.*, banks, corporations, and mutual funds — were involved. Thus, at all times relevant to this case, most OTC transactions involving ECPs were legal. However, they were exempt from CEA regulations,

---

[41] 54 Fed. Reg. 47,002 (Dec. 11, 1987).

[42] Futures Trading Practices Act of 1992, Pub. L. No. 102-546, 106 Stat. 3590, §§ 502(a) (amending 7 U.S.C. § 6), 502(c) (amending 7 U.S.C. § 16(e)(2)(A)). If such transactions are connected with market manipulation or false information, however, the conduct may be subject to civil prosecution by the CFTC. *See, e.g.*, 7 U.S.C. § 9; 17 C.F.R. § 180.1.

[43] 7 U.S.C. § 2(ii) (emphasis added). However, the 2008 Reauthorization Act gave the CFTC anti-fraud jurisdiction over OTC foreign currency contracts for certain purposes. *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 § 13101(a)(B)(i)(II).

including segregation requirements and other customer protections.

**3. Regulation of FCMs**

As of the filing date, and in keeping with the CFTC's focus on regulation exchange-traded derivatives, the CEA defined FCM to mean an entity "engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery *on or subject to the rules of any contract market or derivatives transaction execution facility* . . . ."[44] The CFTC's regulation of FCMs is extensive, and includes registration, disclosure, recordkeeping, and reporting requirements.[45]

Furthermore, the CEA imposes strict segregation requirements for customer funds. Property held by an FCM in connection with a customers' exchange-traded domestic futures is required to be held in a segregated account. The CEA requires that FCMs

> treat and deal with all money, securities, and property received by such [FCM] to margin, guarantee, or secure the trades or contracts of any customer of such [FCM], or accruing to such customer as the result of such trades or contracts, as belonging to such customer. *Such money, securities, and property shall be*

---

44 *Id.* § 1a(20)(A) (emphasis added).

45 *See, e.g.*, *id.* § 6d. FCMs are also required to be members of the National Futures Association, a self-regulatory organization registered with the CFTC. *See id.*

> *separately accounted for and shall not be commingled* with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held . . . .[46]

Similarly, an FCM must hold exchange-traded foreign-futures customer funds "under an account name that clearly identifies the funds as belonging to [the] customers," and such funds "may not be commingled with the money, securities or property of such futures commission merchant . . . or used to guarantee the obligations of . . . such futures commission merchant."[47] There are also segregation requirements for commodity options and leverage transactions.[48]

The CFTC has stated that:

---

[46] *Id.* § 6d(a)(2) (emphasis added). Clearing organizations and depositories are also subject to segregation requirements. *See id.* § 6d(b).

[47] 17 C.F.R §§ 30.7(b), 30.7(e)(2).

[48] *See id.* §§ 31.12(a) ("Any person that accepts leverage customer funds from a leverage customer to enter into or maintain a leverage contract shall treat and deal with such leverage customer funds as belonging to that leverage customer. Such leverage customer funds: (1) Shall be separately accounted for and segregated as belonging to the leverage customer, (2) shall be kept in the United States, (3) shall not be commingled with the funds of any other person, and (4) shall not be used to secure or extend the credit of any leverage customer or person other than the one for whom the leverage customer funds are held."); 32.6 (requiring an FCM to segregate ninety percent of the payment received from the customer in a bank account until expiration or exercise of the option).

> The segregation provisions of the Act and the regulations are intended to insure that customer funds are preserved intact for the benefit of the customers regardless of any financial reverses experienced by the FCM. Proper segregation of customer funds also assures that if bankruptcy occurs, sufficient customer funds can be identified so that an orderly and expeditious transfer of open customer accounts to another FCM can be made, and so that customers may receive their funds promptly.[49]

In furtherance of these objectives, section 1.22 of the CFTC's regulations prohibits the use of one customer's funds to finance the trades of another customer.[50] Thus, one customer's funds cannot be used to meet the margin calls, settlements, or other obligations of another customer. An FCM may deposit its own funds in the customer-segregated account to meet a customer's margin requirement, but may not withdraw its own funds if it would leave any customer undermargined.[51]

### C. Commodity Broker Liquidation

Under subchapter IV, customers are entitled to a pro rata distribution

---

[49] Proposed Prohibition of Guarantees Against Loss, Comm. Fut. L. Rep. (CCH) ¶ 21,149 (Feb. 10, 1981).

[50] *See id.* § 1.22.

[51] *See id.* § 1.23. Once deposited they are deemed to belong to the customer until withdrawn by the FCM. An FCM that fails to satisfy the segregation requirements can have its registration and/or its trading privileges on contract markets suspended or revoked and may also be subject to civil penalties. *See* 7 U.S.C. §§ 9, 15.

from customer property. A "customer" is an entity that holds a claim on account of a "commodity contract."[52] Accordingly, the definition of "commodity contract" is crucial to the determination of customer status.

On September 19, 2008, the Bankruptcy Code defined "commodity contract" to mean:

> (A) with respect to a futures commission merchant, contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade;
> (B) with respect to a foreign futures commission merchant, foreign future;[53]
> (C) with respect to a leverage transaction merchant, leverage transaction;[54]
> (D) with respect to a clearing organization, contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization, or commodity option traded on, or subject to the rules of, a contract market or board of trade that is cleared by such clearing organization;

---

52 *See* 11 U.S.C. § 761(9). The Part 190 Rules provide that "[c]ustomer shall have the same meaning as that set forth in section 761(9) of the Bankruptcy Code." 17 C.F.R. § 190.01.

53 "Foreign future" means "contract for the purchase or sale of a commodity for future delivery *on, or subject to the rules of, a board of trade* outside the United States . . . ." 11 U.S.C. § 761(11) (emphasis added).

54 "Leverage transaction" means "agreement that is *subject to regulation under section 19 of the Commodity Exchange Act*, and that is commonly known to the commodities trade as a margin account, margin contract, leverage account, or leverage contract . . . ." *Id.* § 761(13) (emphasis added).

> (E) with respect to a commodity options dealer, commodity option;[55]
> (F) any other agreement or transaction that is similar to an agreement or transaction referred to in this paragraph . . . .[56]

Section 761(4)(F) — the "similar to" provision — was added in 2005. In discussing an analogous change to the definition of "swap agreement," Congress explained:

> The definition of "swap agreement" originally was intended to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured. To that end, the phrase "or any other similar agreement" was included in the definition. (*The phrase "or any similar agreement" has been added to the definitions of "forward contract," "commodity contract," "repurchase agreement" and "securities contract" for the same reason.*)[57]

Customer property is defined to mean property held on behalf of the FCM's customers.[58] Under the Part 190 Rules, "customer property" is ratably distributed to customers divided into five account classes: futures accounts, foreign futures accounts, leverage accounts, cleared swap accounts, and "delivery

---

[55] "Commodity option" means an "agreement or transaction *subject to regulation under section 4c(b) of the [CEA]*." *Id.* § 761(5) (emphasis added).

[56] *Id.* § 761(4).

[57] H.R. Rep. No. 109-31(I), 128-29 (2005).

[58] *See* 11 U.S.C. § 761(10).

accounts."[59]

**D. The Customer Protection Rule and SIPA**

Under the Securities Exchange Act of 1934, broker-dealers are required to comply with the SEC's Customer Protection Rule ("Rule 15c3-3"), promulgated pursuant to section 15(c)(3) of the Exchange Act.[60] Among other things, this Rule protects customer *funds* by mandating segregated customer bank accounts.[61] And it protects customer *securities* by directing brokerages to obtain possession (or control) of such securities and by precluding use of them in the firm's proprietary business.[62]

Rule 15c3-3 thus helps to ensure that customer property is available

---

59 17 C.F.R. §§ 190.08, 190.01.

60 *See id.* § 240.15c3-3.

61 *See id.* § 240.15c3-3(e)(1) (stating that "[e]very broker or dealer must maintain with a bank or banks at all times when deposits are required or hereinafter specified a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (hereinafter referred to as the Customer Reserve Bank Account) and a "Special Reserve Bank Account for Brokers and Dealers" (hereinafter referred to as the PAB Reserve Bank Account), each of which will be separate from the other and from any other bank account of the broker or dealer. . . .").

62 *See id.* § 240.15c3-3(b)(1) ("A broker or dealer shall promptly obtain and shall thereafter maintain the physical possession or control of all fully-paid securities and excess margin securities carried by a broker or dealer for the account of customers.").

for distribution if the broker-dealer is liquidated. SIPA, enacted shortly after Rule 15c3-3, establishes the Securities Investor Protection Corporation, a "nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges," and a framework for the orderly liquidation of brokerage firms.[63] "SIPA serves dual purposes: to protect investors, and to protect the securities market as a whole."[64]

As explained by the Second Circuit:

> SIPA establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. In a SIPA liquidation, a fund of "customer property," separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers. The customer property fund consists of cash and securities received or held by the broker-dealer on behalf of customers, except securities registered in the name of individual customers. 15 U.S.C. § 78lll(4). Each customer shares ratably in this fund of assets to the extent of the customer's "net equity." *Id.* § 78fff-2(c)(1)(B).[65]

Under SIPA, "[t]he term 'customer' includes . . . any person who has deposited

---

63 *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 58 (2d Cir. 2013).

64 *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011) (citing *SIPC v. Barbour*, 421 U.S. 412, 415 (1975)).

65 *Id.* at 233.

cash with the debtor for the purpose of purchasing securities."[66] A customer is a person who has a claim based on ownership of securities.[67] SIPA defines "security" to include "any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency . . . ."[68] But, "[e]xcept as specifically provided [in the statute], the term 'security' does not include any currency, or any commodity or related contract . . . ."[69]

## V. DISCUSSION

### A. Because MGI's OTC FX Contracts Are Not "Commodity Contracts," It Is Not a "Customer"

"[T]he plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole."[70] Under

---

[66] 15 U.S.C. § 78lll(2)(B)(i).

[67] *See id.*

[68] *Id.* § 78lll(14).

[69] *Id.*

[70] *Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) (noting also that the Court had "several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute") (quotation marks and brackets omitted). *Accord Deal v. United States*, 508 U.S. 129, 132 (1993) (stating that it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word

section 761(4)(A) a commodity contract is defined, with respect to an FCM, as a "contract for the purchase or sale of a commodity for future delivery on, or subject to the rules of, a contract market or board of trade."

MGI concedes that to be a customer under subchapter IV it must have deposited cash for the purpose of making or margining a commodity contract.[71] MGI also accepts that the OTC FX Contracts do not satisfy section 761(4)(A) because they were not delivered on or subject to the rules of a contract market or board of trade. Instead, MGI argues that the OTC FX Contracts were *similar to* FX Futures and thus satisfy section 761(4)(F).

According to MGI, the OTC FX Contracts were "virtually identical to FX Futures from an economic perspective."[72] However, similarity from an

---

cannot be determined in isolation, but must be drawn from the context in which it is used").

[71] *See* Memorandum of Law in Support of Motion for Summary Judgment of Moore Capital Management, LP on Behalf of Claimant Moore Global Investments, L.P. ("MGI Mem."), at 8.

[72] MGI Mem. at 11. These similarities are: (1) "just like FX Futures, MGI's [OTC]FX Contracts were agreements to buy/sell currency in the future for a pre-determined amount of another currency and required physical delivery of the underlying currencies at maturity"; (2) both contracts have counterparty credit risk; (3) "LBI required MGI to post margin in respect of its [OTC] FX Contracts based on the margin that would be due in respect of corresponding FX Futures"; and "MGI's [OTC] FX Contract positions could be, and always were, closed out early

economic perspective is beside the point. Reading section 761 in its entirety as it existed at the time LBI was placed into liquidation, the salient feature of the types of transactions that are defined as "commodity contracts" in subparagraph 4 — futures, foreign futures, leverage transactions, and commodity options — is that they are exchange traded or cleared and thus subject to CFTC regulation, including the mandatory segregation of customer property.[73]

A subsequent amendment to the definition of commodity contract further illustrates this point. "Swaps historically were not subject to regulation under the CEA, and swaps customers were not entitled to any special customer protections under the commodity broker liquidation subchapter."[74] However, in 2010 the Dodd-Frank Act amended the definition of commodity contract to include "any other contract, option, agreement or transaction, in each case, that is *cleared by a clearing organization*."[75] Among other things, this subsection brought

---

by entering into offsetting contracts, with any gains or losses being settled in cash without physical delivery of the underlying currencies." *Id.* at 11, 12.

73 *See* 7 U.S.C. § 6d(a)(2) (domestic futures), 17 C.F.R §§ 30.7(b), 30.7(e)(2) (foreign futures), 31.12(a) (leverage transactions), 32.6 (options).

74 Collier on Bankr. ¶ 760.02

75 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 § 724(b)(1) (2010) (emphasis added).

*cleared* swap transactions into the definition of "commodity contract." Not surprisingly therefore, the Dodd-Frank Act also amended the CEA to require FCMs to segregate money received in connection with cleared swaps.[76]

In enacting subchapter IV, Congress sought to "maintain consistency" with the protections afforded by segregated customer funds requirements in the CEA and provide stability to the futures markets.[77] As explained by another court, "[w]ith the exception of delivery accounts, which deal with specifically identifiable property associated with delivery, the [Part 190] account classes correspond directly to the classes of transactions protected by segregation requirements."[78] Accordingly, the OTC FX Contracts do not qualify as commodity contracts because, as OTC derivatives, they were not subject to the CFTC's core regulatory requirements.[79] For purposes of subchapter IV, any similarities between the OTC

---

76 *See* 7 U.S.C. §§ 6d(f)(2)(A), (B).

77 S. Rep. No. 95-989, at 7-8 & fn.1 (citing 7 U.S.C. § 6d).

78 *In re Peregrine Fin. Grp. Inc.*, 510 B.R. 190, 202 (Bankr. N.D. Ill. 2014), *appeal docketed sub nom. Secure Leverage Grp., Inc. v. Bodenstein*, No. 14 Civ. 5024 (N.D. Ill. July 2, 2014). *Accord* CFTC, Proposed Rules, 46 F.R. 57535-01 at 57536 (Nov. 24, 1981) (describing purpose of the account classes).

79 *See* Collier on Bankr. ¶ 761.05 ("[C]ertain types of derivatives contracts are not subject to [CFTC] regulation under the CEA, and therefore are not commodity contracts for purposes of section 761(4) of the [Bankruptcy]

FX Contracts and exchange-traded futures are outweighed by this important difference.[80]

MGI notes that both "leveraged transactions" offered by a leveraged transaction merchant and "commodity options" offered by a commodity options dealer qualify as commodity contracts under section 761 "despite the fact that such transactions generally are not executed on exchanges or cleared by clearinghouses."[81] However, both leverage contracts and commodity option

---

Code."); 7 U.S.C. § 2(g) (2008) (excluding OTC transactions involving ECPs from the CEA's regulatory protections).

80 As noted by the Trustee, the purported similarities "are not particular to MGI's foreign currency forwards but rather are true of foreign currency forwards generally. *All* foreign currency forwards are contracts for future delivery of a currency and involve counterparty risk (but a different kind of risk than a future)." Trustee's Opposition and Reply in Further Support of Motion for Summary Judgment Confirming the Trustee's Determination of the Moore Global Investments, L.P. Claims, at 16 (emphasis in original).

81 MGI Mem. at 11. MGI's statement is simply wrong. "There are currently essentially only three types of exchange-traded derivative products: futures, options on futures, and options. Each of these products share standardized features that are included in the transaction structure, regardless of what market the transactions are hedging." Over-the-Counter Derivatives Market: Hearing Before the Subcomm. on Capital Markets, Insurance, and Government Sponsored Enterprises of the H. Comm. on Financial Services, 111th Cong. 164, at 166 (June 9, 2009) (statement of Christian Johnson, Professor, S.J. Quinney Coll. of Law, Univ. of Utah)). And leverage contracts, which have a unique history of regulation by the CFTC, are rarely used.

trading are regulated by the CFTC, and both are subject to segregation requirements.[82] In fact, commodity options highlight the connection between customer protection under subchapter IV and CFTC regulation — the reason commodity options were added to the list of commodity contracts in section 761 was that "[a]lthough commodity option trading on exchanges is currently prohibited, it is anticipated that [the] CFTC may permit such trading in the future."[83]

Both parties focus on the distinction between forwards and futures by citing to various characteristics. The Trustee does so because the OTC FX Contracts are similar to forward contracts and the Bankruptcy Code defines "forward contracts" specifically to exclude "commodity contracts."[84] MGI does so

---

82 *See* 17 C.F.R. §§ 31.12(a), 32.6.

83 11 U.S.C. § 761 Advisory Committee Note. It is also worth noting that these transaction types only apply when a leverage transaction merchant and a commodity options dealer are involved, not a futures commission merchant. *See id.* §§ 761(4)(C), 761(4)(E). MGI has not argued that its transactions are similar to either a leverage transaction or a commodity option, and they are not.

84 *See id.* § 101(25) (defining "forward contract" as "(A) a contract (*other than a commodity contract, as defined in section 761)* for the purchase, sale, or transfer of a commodity, as defined in section 761 (8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is

because the CFTC, in an attempt to expand its regulatory jurisdiction, has argued over the years that contracts similar to the OTC FX Contracts are not forwards but (illegal OTC) futures.

However, this debate is not particularly helpful. It mainly adds undue complexity to this case, while also ignoring the historical distinctions between forwards and futures. The CFTC has historically regulated the legal exchange-traded futures. Forwards have also been legal, but have historically not been exchange traded. The term "futures" has thus became synonymous with exchange-traded transactions, and "forward contracts" have become synonymous with OTC transactions.[85]

---

entered into, including, but not limited to, a repurchase or reverse repurchase transaction (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in this section) consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement") (emphasis added).

[85] *See, e.g.*, Black's Law Dictionary (8th ed. 2004) (defining a "futures contract" as "[1] an agreement to buy or sell [2] a standardized [3] asset (such as a commodity, stock, or foreign currency) [4] at a fixed price [5] at a future time, usually during a particular time of a month. [6] *Futures contracts are traded on exchanges such as the Chicago Board of Trade or the Chicago Mercantile Exchange.*"); *see id.* (*defining "forward contract" as a "private, cash-market [1] agreement between a buyer and seller* [2] for the future delivery [3] of a commodity [4] at an agreed price. In contrast to futures contracts, forward contracts are [5] not standardized and not transferable) (emphasis added). *Accord CFTC v. Erksine*, 512 F.3d 309, 323-24 (6th Cir. 2008) (listing numerous sources

It is this commonly accepted usage of "futures" that informs section 761(4). For this reason, MGI's citation to authority distinguishing between cash forwards and futures in the context of CFTC enforcement actions is not helpful.[86] The cases cited by MGI do not address section 761, the Part 190 Rules, or the

---

defining futures as being exchange-traded and forwards as being OTC); Colleen M. Baker, *Regulating the Invisible: The Case of Over-the-Counter Derivatives*, Notre Dame L. Rev. 1287, 1297 (2010) ("Exchange-traded derivatives are sometimes generically referred to as 'futures.' Similarly, OTC derivatives are often generically termed 'swaps.'").

[86] *See* MGI Mem. at 12-15 (citing *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766 (9th Cir. 1995)); *CFTC v. International Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482 (S.D.N.Y. 2004); *CFTC v. International Foreign Currency, Inc.*, 334 F. Supp. 2d 305 (E.D.N.Y. 2004); *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 230 F. Supp. 2d 439 (S.D.N.Y. 2002); *MG Ref. & Mktg., Inc. v. Knight Enters., Inc.*, 25 F. Supp. 2d 175 (S.D.N.Y. 1998); *CFTC v. Standard Forex*, No. 93 Civ. 0088, 1996 WL 435440 (E.D.N.Y. July 25, 1996); *CFTC v. Standard Forex*, No. 93 Civ. 0088, 1993 WL 809966 (E.D.N.Y. Aug. 9, 1993)); *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1493-95 (S.D.N.Y. 1990). I note that these cases are also irrelevant because the jurisdictional dispute at issue — which was based on ambiguous statutory language — is now largely moot as the 2008 Reauthorization Act now makes clear that the CFTC has anti-fraud jurisdiction over OTC foreign currency contracts for certain purposes. *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, 122 Stat. 1651 § 13101(a)(B)(i)(II). This grant of jurisdiction applies even if the transactions were not "futures." Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries, 75 Fed. Reg. 3282, 3285 (Jan. 20, 2010) ("To remedy the large number of fraud cases where jurisdiction had been questioned, the [Reauthorization Act] gave the [CFTC] jurisdiction over certain leveraged retail foreign exchange contracts without regard to whether it could prove the contracts were off-exchange futures contracts.").

exclusion of futures contracts from the definition of forward contracts in the Bankruptcy Code.

Rather, the underlying issue in the cases cited by MGI was whether the CFTC had authority to prosecute misconduct in connection with OTC transactions. In order to expand its anti-fraud jurisdiction, the CFTC argued that the trades at issue were illegal OTC *futures*. In determining whether the contracts were forwards or futures these courts primarily relied on whether the contracts contemplated actual delivery of the commodity.[87]

Not only are these cases not on point, they are stale. More recent cases recognize that standardization and fungibility are more important factors than whether the contracts contemplated actual delivery.[88] For purposes of subchapter

---

[87] *See, e.g.*, *Noble Metals Int'l, Inc.*, 67 F.3d at 772-73; *Cary Oil Co.*, 230 F. Supp. 2d at 457 (holding that contracts were not within cash forward contract exemption to the CEA where they were not predicated upon expectation that delivery of actual commodities would occur and thus contracts were illegal off-exchange futures and unenforceable); *MG Ref. & Mktg., Inc.*, 25 F. Supp. 2d at 184 ("Absent some exception to [CEA section] 4a, the flexies would therefore qualify as illegal off-exchange futures contracts."); *Transnor (Bermuda) Ltd.*, 738 F. Supp. at 1491 (finding that to be deemed a forward contract, the "contract's terms and the parties' practice under the contract [must] make certain that both parties to the contract deal in and contemplate future delivery of the commodity").

[88] *See Erskine*, 512 F.3d at 325-26 (holding that OTC foreign currency contracts were forwards explaining that "anticipation of actual delivery (or lack there of)" was not a "practical distinction" between forwards and futures and

IV, standardization and fungibility are important to the extent that they are predicates for exchange trading — what the CFTC has historically regulated.

Lastly, MGI's reliance on a CFTC release in which it interpreted the term "commodity contract" under section 761(4) to include contracts that are not executed on an exchange is also misplaced.[89] Although the contracts at issue were not executed on an exchange, they were submitted for clearing to a derivatives clearing organization. Accordingly, the transactions were subject to the rules of a

---

instead "the distinction — as commonly understood — turns on the standardization and fungibility of the contract"); *Zelener*, 373 F.3d at 865 ("Using 'delivery' to differentiate between forward and future contracts yields indeterminancy, because it treats as the dividing line something the two forms of contract have in common for commodities and that both forms lack for financial futures."); *Sanders v. Forex Capital Mkts., LLC*, No. 11 Civ. 0864, 2011 WL 5980202, at *10 (S.D.N.Y. Nov. 29, 2011) (relying on *Erksine* and *Zelener* and finding that "[t]he mere fact that, in practice, Sanders may have 'rolled over' his transactions is not sufficient to transform the transactions at issue into futures contracts"); *Sprague Energy Corp. v. Levco Tech Inc.*, No. 09 Civ. 29, 2009 WL 1374593, at *9 (D. Conn. May 11, 2009) (stating that a "'forward contract'" is neither standardized nor traded on an exchange); *In re MF Global Inc.*, 492 B.R. 407, 416 (Bankr. S.D.N.Y. 2013) ("Futures contracts . . . are standardized, exchange-traded instruments.") (quotation marks omitted).

[89] *See* MGI Mem. at 10-11 (citing Interpretative Statement Regarding Funds Related to Cleared-Only Contracts Determined to be Included in a Customer's Net Equity, 73 Fed. Reg. 57235, 57235-36 (Oct. 2, 2008)).

regulated derivatives clearing organization.[90]

Because MGI did not deposit cash for the purpose of margining a commodity contract within the meaning of section 761(4), it is not entitled to customer status. While the Customer Agreement required MGI to post margin, neither the CEA nor any CFTC regulation required that this margin be segregated from other funds. In short, the OTC FX Contracts were not regulated by the CFTC and therefore do not qualify for customer protection under section 761(4).

**B. The Customer Agreement Is Not a Commodity Contract Under Section 761(4)(J)**

Section 761(4)(J) defines "commodity contract" to include

> any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in this paragraph, including any guarantee or reimbursement obligation by or to a commodity broker or financial participant in connection with any agreement or transaction referred to in this paragraph, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562.

According to MGI its claim arises from a commodity contract under section 761(4)(J) because the Customer Agreement expressly authorizes MGI to trade

---

[90] *Cf.* 11 U.S.C. § 761(4)(A) (defining commodities contract to include a "contract for the purchase or sale of a commodity for future delivery on, *or subject to the rules of*, a contract market *or board of trade*") (emphasis added).

futures contracts, provides security arrangements for such contracts, and includes reimbursement obligations by and to LBI as a commodity broker.[91]

There is no merit to this argument. MGI did not actually trade futures contracts.[92] Section 761(4)(J) cannot be read so broadly as to include an account agreement that simply *refers to* transactions that qualify as commodity contracts.[93]

### C. MGI Is Not Entitled to Customer Status Under SIPA

MGI argues that because its account balances were included in the non-regulated commodity component of LBI's 15c3-3 reserve calculation, it is

---

91 MGI Mem. at 18.

92 The record indicates that several exchange-traded futures transactions were executed in MGI's account. However, there is no genuine dispute of material fact that those trades were booked in error. They were reversed as "they were intended for a different Moore entity." 10/27/14 Hearing Transcript at 9.

93 MGI also suggests that the assurances it received from LBI prior to the bankruptcy are sufficient to entitle it to customer status. *See* MGI Mem. at 4-5. But courts have rejected similar arguments. *See, e.g.*, *In re Adler, Coleman Clearing Corp.*, 216 B.R. 719, 726 (Bankr. S.D.N.Y. 1998) ("[T]he fact that an officer of Adler may have agreed that the SR Clearing Account would be treated as a restricted 'customer' account by Adler does not mean that the account qualifies as such under SIPA as a matter of law."); *In re Chicago P'ship Bd., Inc.*, 237 B.R. 726, 726 (Bankr. N.D. Ill. 1999) (stating that a claimant's "subjective belief that he was protected by SIPA does not give him customer status under SIPA, nor does it entitle him to the protections afforded to customers by SIPA"). Furthermore, a sophisticated ECP would be expected to know the risks of entering into unregulated bilateral transactions.

entitled to customer status under SIPA.[94] However, under SIPA "customer" is defined as "any person who has deposited cash *for the purpose of purchasing securities*."[95] There is no genuine dispute of material fact that MGI did not purchase securities. Accordingly, MGI is not a customer entitled to customer status under SIPA.

**D. MGI Is Not Entitled to Summary Judgment on the Property of Estate Issue**

MGI argues that the Trustee does not have a legal or equitable right to the Net Cash Balances under section 541(a) of the Bankruptcy Code. MGI claims that either the account documents or SEC Rules 15c3-3 and 15c3-2 are sufficient to create a trust for its benefit that precludes inclusion of the funds into the estate.[96]

MGI has not sufficiently developed this argument. For example, MGI has not shown the creation of an actual or constructive trust by virtue of the Customer Agreement under applicable state law. In addition, there appears to be a genuine dispute of material fact as to how the SEC Rules applied to MGI's margin funds. For these and other reasons, MGI is not entitled to summary judgment on

---

94 *See* MGI Mem. at 19-23.

95 15 U.S.C. § 78lll(2)(B)(i)(emphasis added).

96 *See* MGI Mem. at 23-25.

the issue of whether the margin funds are property of the estate.

However, contrary to the Trustee's contentions, there is no apparent conflict between MGI's property-of-the-estate argument and either SIPA's or subchapter IV's customer protection regime. The Trustee has already paid all uncontested SIPA customer claims, has made significant payments to general creditors, and has not administered a subchapter IV estate.

## VI. CONCLUSION

For the foregoing reasons, the Trustee's motion is GRANTED to the extent of confirming its determination that MGI's claim is not entitled to customer status, and MGI's motion is DENIED. Further proceedings are necessary to determine whether the Net Cash Balances are property of the estate. A status conference is scheduled for March 26, 2015 at 3:30 p.m. The Clerk of the Court is directed to close these motions [Docket Nos. 36 and 41].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
March 17, 2015

**- Appearances -**

**For Claimant Moore Capital Management, LP, on behalf of Moore Global Investments, L.P.:**

Jeffrey M. Eilender, Esq.
Erik S. Groothuis, Esq.
Samuel L. Butts, Esq.
Schlam Stone & Dolan LLP
26 Broadway
New York, NY 10004
(212) 344-5400

Lauren Teigland-Hunt, Esq.
Teigland-Hunt LLP
127 West 24th Street, 4th Floor
New York, NY 10011
(212) 269-1600

**For *Amicus Curiae* CFTC:**

Jonathan L. Marcus, Esq.
Robert R. Wasserman, Esq.
Robert A. Schwartz, Esq.
Anne W. Stukes, Esq.
U.S. Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

**For James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers, Inc.:**

Michael E. Salzman, Esq.
Anson B. Frelinghuysen, Esq.
Marlena C. Frantzides, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000